The People of the State of Illinois on the Relation of Donald L. Hermann, Plaintiff-Appellant, v. Russell C. Jenkins and Marcia Jenkins, Defendants-Appellees.

## Gen. No. 11,571.

Second District, First Division.

February 26, 1962.

Oplatka, Pavec & Oplatka, of Berwyn, and Edward J. Fleming, of Chicago, for appellant.

Leren & Burek, of Wheaton, for appellee.

DOVE, P. J.

This is a habeas corpus proceeding by which Donald L. Hermann seeks to secure the custody of his son, Lawrence Scott Hermann, and from an order denying him the relief sought, he appeals.

The record discloses that after graduating from high school, Patricia Jenkins, the mother of Lawrence

Scott Hermann, attended Stevens College at Columbia, Missouri for one year. Donald L. Hermann graduated from Downers Grove Community High School in June, 1948. Following his graduation he assisted his father on the farm where he lived for six months and then entered the employ of Kroehler Manufacturing Company of Naperville, Illinois. While' so employed and on December 4, 1950 he entered the United States Air Force and while stationed at his base in Texas he and Patricia Jenkins were married. Donald went overseas and Patricia lived with his parents for a few months and then returned to the home of her parents in Lombard, Illinois.

On July 3, 1952 Lawrence Scott Hermann was born at the hospital in Great Lakes. When two days old his mother, Patricia, left the hospital and with her baby and accompanied by her mother, returned to her parents' home. Patricia was emotionally disturbed at that time and was unable to take care of her baby. She remained at the home of her parents for four or five months but all the care of the baby devolved upon her mother, Mrs. Jenkins. Patricia then left the home of her parents and rented a room in LaGrange, secured employment and remained there for one year. Frequently she came to the home of her parents and saw her child who was being cared for and supported by her parents. From LaGrange she went to Pittsburgh. How long she lived there the record does not disclose but the last time her parents saw or heard from her was when her baby, referred to in the record as Scotty, was fifteen months old. Subsequently she instituted a divorce proceeding on the ground of cruelty but how that proceeding terminated does not appear from the record.

In February 1953 Donald L. Hermann returned from Korea and upon his discharge from the Air Force in December 1954, went to the home of his parents in

Downers Grove and lived with them from December, 1954 until October 15, 1960. On September 28, 1960 he was granted a divorce from Patricia Hermann and awarded the custody of Scotty by a decree rendered by the Circuit Court of DuPage County. Donald L. Hermann testified that the last time he saw his wife was in February 1953 upon his return from Korea and that after his discharge from the service and his return to his parents' home in December 1954 he saw Scotty at the home of his maternal grandparents once or twice a week and that his visits to him continued until October 15, 1960.

On October 15, 1960 Donald L. Hermann married Vera Jandus who had previously been married twice but had no children by her former marriages. She testified that she was 18 years of age when she was married the first time; that she lived with her husband for three months and then divorced him on the ground of cruelty. Her second husband had an eleven year old son by a former marriage and she made a home for him for the year she and her husband lived together. At the time of the hearing she testified that she was 29 years of age and the owner of a modest home of four or five rooms in Willow Springs, which was encumbered by a substantial mortgage upon which $100 was being paid each month. Mrs. Hermann also testified that she owns an automobile which she uses in connection with her employment in the traffic department of the Argo Corn Products Company where she has worked five days each week from 8:30 o'clock a. m. until 5:15 o'clock p. m. during the past four years and where she is presently employed. For her services she receives a salary of $187 every two weeks. Mrs. Hermann testified that she and Mr. Hermann had been going together for six months, before they were married; that she had seen Scotty twice; that she had no religious affiliation and never

257

had and did not attend the Catholic Church with her husband.

Donald Hermann testified that he was a Catholic and attended St. James Church at Sag, Illinois regularly and he had previously attended St. Joseph's Church in Downers Grove and had taken his son, Scotty, to that church. Reverend Father Hughes was called as a witness by defendants and testified that he had previously resided at St. Joseph's Rectory and was assistant priest to Father Kiley in Downers Grove; that he knew Donald Hermann and also the defendants, Mr. and Mrs. Jenkins; that he never saw Scotty with his father at church but that he understood that even though Mr. and Mrs. Jenkins were not of the Catholic faith they were seeing to it that Scotty was being reared as a Catholic.

Donald Hermann further testified the relationship between him and Mr. and Mrs. Jenkins, after he returned from Korea was very cordial and he had "the freedom to come into the Jenkins house just as a son-in-law would"; that the only difficulty they ever had arose "in September 1960 when the present Mrs. Hermann and I came to the Jenkins home and made a demand for the child. Until September, 1960 I made no demand of Mr. and Mrs. Jenkins for the custody of my child. I was satisfied during the whole period he was there for conditions to remain as they were. During my service, after the child was born, I did not make any payments to Mr. and Mrs. Jenkins. I had an allotment out for my wife and child. Where the money went, I can't tell you. It went to my wife wherever she was. I never investigated as to whether or not Mr. and Mrs. Jenkins were receiving any money. I didn't know until I came out of the service that Mr. and Mrs. Jenkins never received one penny. I have no idea what medical expenditures were made on behalf of Scotty in the past eight and one-half years.

It wouldn't surprise me to learn that the medical expenses alone were in excess of $4000 because I know the difficulty he has. I know he has had a lot of sickness. I feel that I can financially meet the future in terms of the medical requirements of this child. I know of the deficiency in the eyes of Scotty. He wears glasses. I know that he needs constant medical treatments for those eyes. I am acquainted with the fact that my boy is susceptible to respiratory ailments. He has had constant care over the last eight and a half years for this reason. I know that he was out of school a lot the last fall school year with respiratory ailments. . . . Mr. and Mrs. Jenkins have discussed some of the physical infirmities of my son with me. They never discussed with me the cost of paying for the correction of these infirmities. They never directly discussed the cost of his musical education with me. They never asked me for any specified amount of support for my child. They never asked me for any support of my child. I was allowed to take Scotty out every week unless he wasn't feeling well. I used to take him to church every Sunday morning if he was feeling up to par."

Donald Hermann further testified that after spending four years in the Air Force he was discharged as a Staff Sergeant. He worked for a year as a laborer on a golf course, then as an apprentice mechanic in a garage and for the past two years has been employed by the Imperial Construction Company as a laborer and leaves his home for work at 6:45 o'clock a. m. returning at 5:45 o'clock p. m. In addition to his wages approximating $105 per week he testified that he has an additional income of $500 to $1000 per year from a farm belonging to his parents. He further testified that he has $1100 in savings accounts.

Upon the hearing Mrs. Jenkins testified that she was 59 years of age and for the past 19 years has been

engaged in teaching; that she has a bachelor's degree and her present salary is $6000 per year. She further stated that the mother of Scotty was her only child and that the feeling which existed between the maternal grandparents of Scotty and Scotty's father was cordial and their relationship and contacts pleasant; that after Donald's discharge from the Air Force and upon his return to civil employment he made contributions for Scotty's support; that he contributed no stated amount but gave what he felt he should and the amount was never questioned. During the eight year period Mrs. Jenkins estimated the aggregate amount of his contributions at $3600 and this is the only evidence in the record on this feature of the case. She further testified that during this same period she and her husband had expended more than $4000 in medical care alone for Scotty.

Mrs. Jenkins further testified that a week before Donald married his present wife, Vera, he, Donald, came to the Jenkins' home. According to the uncontradicted testimony of Mrs. Jenkins, as abstracted by counsel for appellant, this is what occurred: "He came in alone and after we put Scotty to bed, Don called me the same thing Scotty did, Nana. He said 'Nana, we are going to have a family talk'. I said, 'Oh, what is it about'. He said he had come over to court and got custody of the child. We didn't know anything about the divorce case. He was coming to our home at the time he was doing this, but I had no notice of it. It came as a complete surprise. We tried to talk him (Donald) into leaving him (Scotty) with us and we said, 'well, why don't you wait?' I thought it was nice he was getting married but I said, 'why don't you wait a year until you get your marriage adjusted and get used to each other, and then work Scotty over, if you insist on taking him, in a gradual way, taking him for a day now and then at first, and

260

then for a weekend and then in the spring for a week, but not make it an abrupt thing?' He said he would be back on Sunday night with Vera (Donald's fiancee) to talk it over. Vera came over and did most of the talking. They said they were going to take him within a week, and they were going to get married on Saturday and were coming to get Scotty on Sunday and I was to have all his clothes ready. We tried to talk about his future and what was best for him, and she said their minds were made up. I asked what about his organ lessons and she said that was just one of the luxuries he could learn to do without. We begged Don and his future wife to go with us to one of the Universities for counseling and we would take care of the cost because we were concerned about what would be best for Scotty and they refused to go. We went down and talked to Father Hughes. Although I was not a Catholic, I had done all of his teaching to get him ready for his first communion. Everything he had to know about that, I taught him. My dad is a Methodist minister and I was raised in a Methodist Church. Scotty got his first communion. They were very complimentary at the church about the way I handled it, even Father Hughes. The reason we went to Father Hughes was that we had been told by Mr. Rybinske, who is a Catholic, that Father Hughes had been counselling in Chicago before he took over the parish and we went and talked to him because we didn't know where to turn. . . . There was never any problem with Donald taking his son and bringing him back. The trouble arose when they came into our home and said they were going to take Scotty and that he would not be allowed to visit us again. Up until October there didn't seem to be a possibility that Don was going to take him. . . . When Don Hermann talked about the custody of Scotty, Russell (defendant Russell Jenkins) offered them the farm. If it was

261

going to be I wanted it to be, a gradual thing, but they wouldn't agree to that. Don wasn't too happy about his work and knows that we have the farm, and Russell offered to let him have the farm at no expense for two years. They could have the complete profit for two years. After that we would like them to set aside a certain amount for Scotty each year. Our idea was that Scotty loves the farm and he liked going out to Hermann's to visit with Grandma Hermann, and we thought if Scotty could gradually work over to going down there and visiting them, his extreme liking for the farm would help bridge this gap."

This testimony of Mrs. Jenkins is corroborated by her husband who testified that he is 58 years of age, holds an A.B. degree. in Electrical Engineering, has taught high school science and mathematics and at the time of the hearing was employed by Western Electric Company and had been for 32 years. He testified that he owned his home in Lombard where he and his wife and Scotty lived; that this home is encumbered with a $6000 mortgage; that he is also the. owner of 142 acres of land in northwest Missouri and also property in Arkansas valued at $6000 and that he has investments in excess of $50,000.

The record shows that Scotty has a good mind and his intelligence is above normal. He does well in his school work, is interested in music and is a member of the school band. He was born with a rotary hip, pronation syndrome, and is required to wear special shoes. He has a severe eye condition, double vision, and wears glasses which require changing every six months. He is also subject to a respiratory infection with ear complications and has a speech defect. Due to his physical condition he is frequently absent from school having missed 48 days during the 1959 school year.

Scotty is quite emotional and sensitive and in the opinion of his teachers and others who testified his

ability to adjust himself to new situations is difficult. In the opinion of Robert C. Austin, a school psychologist and in the opinion of Dr. John E. Halsag, a physician and psychiatrist, if Scotty's environment was changed and he were uprooted from his present surroundings the effect upon him would be severe and adverse.

At the conclusion of the hearing and after both sides had rested the trial court inquired of counsel whether they wished Scotty brought into court for interrogation by counsel or whether there was any objection to the court interviewing him personally and privately. Counsel for both sides stated that there was no objection and by agreement of all the parties and their counsel the court had a conference with Scotty in his chambers. In deciding the case the court referred to this conference stating that he had spent the greater part of a morning with Scotty in order to get to know him and in order to be sure that the decision that he rendered would be in his best interests. The court said that Scotty made good grades in school, was quite brilliant, and that he was going to have to depend on his brains for a livelihood. The court called attention to the fact that the father and grandparents of Scotty were merely his custodians and suggested that all the interested parties take a realistic view of the situation and realize that the interest of the court and the officers of the court is primarily concerned with the welfare of Scotty whose grandparents have provided a home for him and have taken care of him from birth. The court then concluded: "It would be the cruelest decision that this court could make to remove the boy from the environment he is in."

Counsel for appellant asserts that the record discloses that appellant has not forfeited his paramount right to the custody of his son; that all the evidence is to the effect that appellant is a fit person to have his custody; that the father has a proper and an available

home for him and is willing and able to give him good care and furnish him with the necessities of life. Counsel insists that the findings of the trial court were "mere assertions of vague generalities and devoid of specific meaning."

In support of this contention counsel cite numerous cases. Among those referred to is Giacopelli v. Florence Crittenton Home, 16 Ill2d 556, 158 NE2d 613. From this case counsel quote at length from the concurring opinion which refers to the "nebulous" phrase "best interests of the child." The concurring opinion in that case does state that before a child can be taken from his or her parents against their will it should be necessary that the parents be found unfit persons. The opinion of the court however, does not make that requirement. The concurring opinion recognizes that fact and the writer of the concurring opinion and those who joined with him concurred in the decision because in the Giacopelli case, the unfitness of the parents was clearly shown.

In the course of its opinion in the Giacopelli case the court said: (citations omitted pp 565–566) "It is always recognized that a natural parent has a superior right to the custody of his child. That right, however, is not absolute and must yield to the best interest of the child. Such superior right only obtains when it is in accord with the best interest of the child. The parent need not be shown to be totally unfit to rear the child in order to deny to him the custody of the child. Fitness of the parent is only one of the factors to be considered in determining how the best interest of the child may be served. The sufficiency of the parents' home, its surroundings, and all other matters that have a bearing upon the welfare of the child are to be considered. The parents' natural rights must give way to the welfare and best interest of the child. . . . It is not necessary that the natural parents be found

264

unfit. That is only one of the many circumstances that may be considered in the determination of the one question in such a case as this. . . . We cannot speculate with the life of a child, and we must accept that which is apparent. We cannot uproot the child from an adoptive home full of love, care and opportunity, for the sole and only purpose of placing him with his natural parents—one of whom has abandoned him, and where the past conduct and character of the other fails to inspire any degree of confidence." In concluding its opinion the court said: (pp 566–567). "Finally, the trial judge had the best opportunity to observe the parties and their conduct and demeanor while testifying. This is a vital factor in evaluating the correctness of his determination. We should not disturb his findings unless they are palpably against the weight of the evidence. Upon our review, we cannot disagree with his findings. To remand this child to his natural parents would appear to constitute a tragic and unfortunate event in his young life."

Kokotekian v. Kokotekian, 23 Ill App2d 171, 161 NE 2d 712, was a petition to modify a divorce decree which had awarded, by stipulation of the parties, custody of the minor daughter of the parties, to the paternal grandmother. Two years later the father petitioned the court to award the custody of his daughter to him. In affirming the order of the chancellor, which dismissed the petition, leaving the custody of the child with her grandmother, the court said that the evidence disclosed that the paternal grandmother had had the care, custody and control of the child most of the time since its birth, had given her a good home and excellent care and that the child was happy. The court then said that the controlling question in litigation involving the custody of a child is: "What is for the best interests of the child?" The court then cited and quoted from the Giacopelli case and con-

cluded that the finding of the chancellor was not against the manifest weight of the evidence.

In the instant case the record does not show that the father of Scotty is an unfit person to have his custody but it clearly shows that the future welfare of Scotty requires that he continue in the custody of those who have had his care, nurture, control and education since his birth on July 3, 1952.

Among the reasons which prompts us to this conclusion are these:

(1) Lawrence Scott Hermann has spent his entire life, (it will be 10 years on July 5, 1962) in the home of his maternal grandparents. He has never had the care of anyone other than appellees, his maternal grandparents. His mother took no care of him. She disappeared when he was a baby.

(2) The father of Scotty was in the service when he was born and never saw him until he returned from Korea.

(3) From July 1952 until December 1954, Scotty's father made no contributions for the care and support of his son and made no inquiries regarding his support.

(4) For more than eight years the father acquiesced in everything that was being done by the grandparents for his son and was pleased to have them give Scotty the ministrations, care and love they lavished upon him.

(5) For almost ten years appellant has only been in his son's company for only brief periods.

(6) Scotty has a brilliant mind but has some physical handicaps and his needs are more than a normal boy of his age. All of his requirements have been met by appellees. No one can read this record and come to any conclusion other than that his maternal grandparents can best supply his needs and furnish the required environment to which he has been accustomed. It does

not appear that appellant is so circumstanced that he may be able to meet the needs this record shows Scotty may require.

(7) The contribution made by the father to the maternal grandparents since the birth of Scotty is substantially less than the amount expended by the grandparents for medical services alone.

(8) While it is impossible for anyone to determine the amount or quality of the love and affection a father may have for a child with whom he has never had any close association and in whose presence he has been only occasionally, the natural instincts of love, care and interest which these grandparents bear for this child must substantially outweigh the love and concern which Donald Hermann may entertain for Scotty.

The record discloses that from the date of Scotty's birth on July 3, 1952 the defendants, Mr. and Mrs. Jenkins, have had his exclusive control and custody; that he has resided with them in their home and they have ministered to his every need. They have nurtured, cared for and furnished him with shelter, clothing, medical care, food and every material thing a growing child required. In addition they have directed his physical, mental, spiritual and religious education. They have lavished upon him their love and affection. This arrangement was entirely satisfactory and agreeable with Donald Hermann for more than eight years and three months before appellant sought to change it. The best interests of Scotty require that it be not discontinued.

If the custody of Scotty be given to his father, Scotty would necessarily be in a very different domestic atmosphere from that in which he now lives. The overall care and solicitude his grandparents have shown for him for almost ten years would be missing. He would miss the help, presence and affection of

the only parents he has ever known. The result could only result in suffering and unhappiness. As the trial court stated, to remove Scotty from the environment he has been accustomed to and place him where the record discloses he would live, would be most cruel. To uproot him from the home he has enjoyed since birth, a home full of love, care and opportunity, and place him in a new home, just established, whose permanency is not assured and with a father with whom he never lived or had any close association and with a stepmother who is a complete stranger, would be a tragedy. We cannot speculate as to what the result might be upon the physical body and the sensitive soul of this boy, who is happy and well adjusted to his present way of life. (Giacopelli v. Florence Crittenton Home, 16 Ill2d 556, 158 NE2d 613; The People v. Weeks, 228 Ill App 262, 270.)

The chancellor had the opportunity to observe the interested parties to this proceeding, the several witnesses who testified and their conduct and demeanor while testifying. His findings and conclusions, under all the authorities, should not be disturbed unless they are manifestly against the weight of the evidence. The record sustains the judgment of the trial court and the judgment order appealed from is therefore affirmed.

Judgment order affirmed.

McNEAL and SMITH, JJ., concur.