**Dora E. McAdams, Plaintiff, v. Harvey McAdams, Defendant.**
**Dora E. McAdams, Respondent-Appellant, v. Patsy McAdams, Petitioner-Appellee.**

**Gen. No. 10,487.**

Fourth District.

March 6, 1964.

 

Wiseman, Hallett & Mosele, of Alton, for appellant.

Julian Hutchens, of White Hall, for appellee.

SPIVEY, J.

The subject of this appeal is an order of the Circuit Court of Calhoun County which modified a former order of that court as it related to custody of the two adopted minor children of Harvey and Dora McAdams.

Dora McAdams appeals to this court from an order which awarded the custody of these two children to Patsy McAdams, the widow of Harvey McAdams.

Harvey and Dora McAdams adopted three children during their marriage. In 1956, they were divorced and the custody of the two minor children was awarded to Harvey because Dora was obliged to care for a sister who was suffering from cancer. Dora received the custody of the older child. The court found that Dora demeaned herself properly during the marriage and that Harvey committed acts of extreme and repeated cruelty upon Dora. Each spouse was given reasonable rights of visitation with the child or children in the custody of the other.

After their divorce Dora was married and divorced three times, twice to the same person. Lewis Plogger divorced her for cruelty and a month later they were remarried. The other two divorces were apparently secured for faults of her spouse. At the time of the hearing in this cause she was divorced.

Harvey married Patsy Whitehead, and he and Patsy lived together with Patsy's two children by a previous marriage, the two adopted children of Dora and Harvey and a child born to Harvey and Patsy.

On July 23, 1962, Harvey was killed as a result of an industrial injury and thereafter on August 13, 1962, Dora McAdams filed her petition to modify the decree of the Circuit Court of Calhoun County and to secure custody of her two adopted children.

A similar petition to modify the decree was filed by Patsy McAdams on October 8, 1962, and the parties stipulated to have a hearing on both petitions on February 15, 1963.

After the hearing the court entered an order modifying the decree and granted custody of the minor children to Patsy McAdams. The order recited that each party consented that the petitions be consolidated and that a hearing be held thereon. In addition the order recited that Patsy McAdams was receiving social security benefits. Also the court found that Dora had been married and divorced as recited herein and found that she had no church affiliation. On the other hand, the court found that Patsy McAdams and the children attended church regularly. The abstract shows that she and the children attend church but there is no indication as to the frequency of the attendance. The court further found that Dora did not regularly visit the children after the decree of divorce but did visit with them on several occasions. Finally the court found that Dora had forfeited her right to the custody and care of the children, and that Patsy was a fit and

proper person and that the best interests of the children would be served by awarding the custody of the children to Patsy McAdams.

The plaintiff contends now that the court had no jurisdiction over the subject matter or the person of Patsy McAdams. As was previously stated, Patsy McAdams filed a petition in the cause, thus submitting herself to the jurisdiction of the court. There is no question but that the court had jurisdiction over the subject matter. Plaintiff made no objection in the trial court to the manner in which Patsy McAdams entered the litigation and consented to a consolidation and hearing on both petitions. It would have been proper for her to have petitioned for leave to intervene but this was not done. She was an interested party since she had physical custody of the children and this interest was sufficient to justify her presence in the litigation. Plaintiff's contention on this point is technical rather than substantive and now comes too late.

But there are very real and very difficult questions which are properly presented to this court for its consideration. We must weigh the custodial rights of a sole surviving adoptive parent against the custodial rights of a stepmother who is not related to the children but who has shared physical custody of the children for thirteen months and had sole custody for approximately one month before the petition to modify the decree was filed. From a purely legal standpoint we are presented with a contest between one with the legal right to custody, unless she is to be deprived of it, together with the duty to support as against one with no right to custody, unless she is to be awarded it, and no duty to support. We must resolve the contest by resort to nebulous phrases and inconsistent rules of law giving *full* consideration to the primary and superior right of the parents to the

297

custody of the child and a consideration of that which will best serve the welfare or best interest of the child. Thus, parents are entitled to custody of their child unless they are unfit or if not unfit the "welfare" of the child would be best served by denying the parents custody of their child. So it is apparent that the test is in fact no test and each case must be heard on its own facts in search of the ephemeral concept "welfare."

Unfortunately no court in Illinois has defined "welfare" as herein used so that we can measure the prospects of these children with the two contestants. Mr. Justice Klingbiel called for a standard in his concurring opinion in Giacopelli v. Florence Crittenton Home, 16 Ill2d 556, 158 NE2d 613. He stated, "Where the issue is nothing more specific than welfare, the range of inquiry is virtually unlimited, with corresponding room for arbitrary or personal decision." In that case the majority disclaimed interest in the financial situations of the parties beyond an ability to support and educate, but the court expressed interest in the physical advantages of the two homes, and in the sufficiency of the homes. The court was also interested in the past conduct and character of the respective contestants as relating to their fitness. Likewise the marital experience of the petitioners was considered.

It must be the law that a natural parent or an adoptive parent shall retain custody of his child as against all the world if certain basic conditions of decency, respect, and guidance prevail in the natural or adoptive parents' home. If such were not the rule then the statement in the majority opinion of the Supreme Court in the Giacopelli case that, "It is always recognized that a natural parent has a superior right to the custody of his child," would be meaningless and swallowed up in the all encompassing test

"welfare." Can there be any doubt that for almost any child a home could be found which offers greater physical advantages? Are there not people whose past conduct and character, whose efforts and accomplishments shine as a star in the eyes of all as compared to the flicker of light generated by the efforts of the ordinary parent? There are those whose marital experiences would serve as a model to most of us. But this is not to say that these few shall enjoy the custody of our children at their request.

It would be difficult to conceive of a single child so situated that an improvement in his family life in one respect or another, or in the total picture could not be made. For this reason man is gregarious and he shares his accomplishments, one with the other. In addition to the training received in the home, children receive spiritual training in the church, academic training in the school, and citizenship and culture from many other sources. Society does not demand that in order that a parent may retain custody of his child he be a school teacher, a minister, a scoutmaster, a dancing master or musician. We require only that parent to be morally and mentally fit to prepare the mind and body of his child to receive the many advantages that our society offers.

Many cases from Illinois have been called to our attention but it would serve no purpose to analyze, distinguish or discuss them. The trail inexorably leads to Giacopelli v. Florence Crittenton Home and the absence of any pronouncement giving meaning to "welfare" or "the best interest of the child."

Other states have met and answered the problem to our satisfaction. In the case of In re Bourquin, 88 Mont 118, 290 Pac 250 (Mont 1930) the parents of two children were divorced. Custody of the girl was awarded to the father and the boy's custody was awarded to the mother. The wife moved from Montana

to Washington, D. C. On the death of the father, the mother requested custody of the girl and the grandmother who had assisted the father in caring for the girl since the divorce contested the petition. The court said, "Manifestly, the expression 'welfare of the child' was never intended to penalize a parent because he may not be financially able to provide his child with the comforts and advantages which more fortunate parents may provide for their children. All the law requires is that the parent be honest and respectable, with disposition and capacity to maintain and educate his child."

To the same effect is Starr et al. v. Gorman, 40 A2d 564 (NJ 1945). There the mother died shortly after the birth of the child involved. The child was raised by the maternal grandparents but the father visited and contributed regularly. Upon his remarriage he asked for custody. The court said, "The welfare of the child is, of course, the controlling element on an application of this nature. This does not mean, however, that merely because the petitioners are in a position to give the infant more in a material way than is the father, the child should go to them. (Citing cases.) The welfare of the child must be considered with due regard only to the father's means and station in life."

In Grove v. Grove, 21 NJ Super 447, 91 A2d 363 (1952) in a contest between the mother and the paternal grandparents, the court said, "Before the court will subordinate the legal right of the mother in this case to the desire of the paternal grandmother, the circumstances must be such that if the child is returned to the mother, the personal safety, morals, health and happiness of the child will be imperiled."

■ In Illinois, there too, exists a legal right in the surviving parent to a child's custody, subject only to the consideration of the child's "welfare." Section

300

132 of the Probate Act (Ill Rev Stats 1963, c 3, § 132) provides, "When both parents of a minor are living and are competent to transact their own business and are fit persons, they are entitled to the custody of the person of the minor and the direction of his education; and if one parent is dead and the surviving parent is competent to transact his own business and is a fit person, he is similarly entitled. . . ."

We agree with the foregoing authority and conclude that considering "welfare" of the child, or "best interest of the child" in the light of these decisions will allow this court to give meaning to our Supreme Court's recognition of the paramount right of the parent and the need that the child's "welfare" or "best interest" be considered.

The law should not and does not demand that each individual shall attain the same level of achievement, but rather, recognizing the physical, emotional, and mental differences in individuals, the law requires only that individuals shall attain a reasonable standard of decency, opportunity and respect so that his children may partake of that which society has to offer, subject only to his own individual limitations.

Considering this as the true meaning of "welfare" we are of the opinion that the trial court erred in awarding the custody of the minor children to Patsy McAdams. We conclude that the court's order asserting that Dora McAdams had forfeited her right to the custody of the children is contrary to the manifest weight of the evidence.

The case of Jarrett v. Jarrett, 348 Ill App 1, 107 NE2d 622, is very helpful in determining that there was no forfeiture of Dora's right to custody. In the Jarrett case the parents never lived together. The husband was divorced for his desertion and the mother or grandparents always had custody. At one time the father remarked that he would not take custody of

the child. He visited the child only four times during the four years of the child's life and contributed twenty dollars per month most of the time. After the mother's death, the father requested custody from the grandparents. The court held that the father did not forfeit his right to custody and that there was no showing that he was unfit. The court also concluded that the law presumes the interest and welfare of the child to be best served in the custody of its parents, absent a showing to the contrary and that the evidence offered fails to rebut the presumption in favor of the surviving parent.

In the instant case both of the contestants have been divorced. Dora, once for her fault and three times for the fault of her spouse, including the adoptive father of the children. Dora allowed the adoptive father to have custody of the younger children because she had to care for a sister who was dying of cancer. The order provided that her husband should have custody "for the time being" and awarded custody of the older child to her "for the time being." Thus certainly she was found to be a fit person to have custody of the other child. The record shows that she raised the children from 1953 to 1956, whereas Patsy had the children only thirteen months when the petition was filed. Dora visited with the children while they were in the custody of their father but not frequently after the father's remarriage. She stated she felt she was not welcome. This is a reasonable assertion and if her visits were restricted because of friction, we cannot criticize her for her refusal to inject discord into the home of children she loved. Dora does not now attend church but she has promised the court that she will see that the children do if she has custody of them.

Patsy has a home consisting of four rooms and bath and there are presently six persons sharing these

rooms. Dora has three rooms and bath and has made arrangements to secure four rooms and bath if she has the children.

There is absolutely no evidence to show that Dora was unfit to have the custody of the children and any funds available to the children by reason of the death of their father would be equally available to Dora.

Considering all the evidence we are of the opinion that here we have a contest between two sincere, good women, each of whom loves the children and desires their custody and each of whom can and will furnish the children a respectable, decent home and home life.

This being so the right of the parent surpasses that of the stepmother who is in law a stranger. The court erred in awarding the custody of the children to Patsy McAdams. Therefore, the order of the Circuit Court of Calhoun County, awarding custody of the children to Patsy McAdams, is reversed and the cause is remanded with directions to enter an order granting the custody of the children to the Plaintiff, Dora McAdams.

Order reversed and cause remanded with directions.

CROW, P. J. and SMITH, J., concur.