In the Matter of the Guardianship of Clare Susan Nichols, Barbara Bair Nichols, Julia Marie Nichols, and Stanley Bair Nichols.

Dorothy Bair Nichols, Deceased, Plaintiff, v. Ira G. Nichols, Jr., Defendant.

Ira G. Nichols, Jr., Defendant-Respondent-Appellee, v. Nancy Ann Nichols, Intervening Petitioner-Appellant.

Gen. No. 10,706.

Fourth District.

May 9, 1966.

Reno, O'Byrne & Kepley, of Champaign (J. Michael O'Byrne, of counsel), for appellant.

Summers, Watson & Kimpel, of Champaign, for appellee.

SMITH, J.

The mother of five children, to whom custody had been awarded in a divorce decree almost five years before, died on May 15, 1965. A little over 30 days later, the father filed his petition to modify the decree and sought custody of the four minor children. An adult daughter, then 19 years old, intervened and asked that she be named their guardian and be awarded their custody. The trial court awarded custody of the oldest minor daughter to her adult sister, the intervening petitioner; and the custody of the remaining three children to their father. The intervening petitioner appeals. There is no cross-appeal by the father. The sole issue is the claim that the trial court order is contrary to the manifest weight of the evidence on the issue of the best interests of the children.

The father and mother were married November 16, 1944, and divorced January 10, 1961, at the suit of the

mother charging extreme and repeated cruelty. The mother did not remarry. On October 17, 1961, the father married his present wife, a widow with a married son and a son 13 years old. All parties resided in the Champaign area until January 1963, when the father and his new family moved to Ocean Springs, Mississippi, near Biloxi, where he is employed on the medical staff at a Veteran's Hospital at an annual salary of $14,500. At a conference on June 18, 1965, the girls stated they did not want to go with their father to Mississippi. His petition for custody was filed the same day. The intervening petition followed immediately. Issues were made up and a full hearing followed. At the time the ages of the children were as follows: Nancy, intervening petitioner, 19; Clare, 16; Barbara, 13; Julia, 11; and Stanley, 7.

The trial court had before him a family unit which had been shattered once by divorce and now by the death of the parent to whom custody of the children had been originally awarded. A regrouping and readjustment of that unit was now required. The question was when, where, and with whom. In this tense emotional atmosphere, it is to be anticipated that we would have some difficulty in determining what is fact and what is fictional innuendo in this record.

At the outset we would put back in the closet any question of economics or the physical aspects or atmosphere of the home which the children own in Champaign and the father's home in Ocean Springs. Both homes would appear to be amply adequate. It further appears that about a year before the divorce, the first Mrs. Nichols established a trust now valued at some $250,000, and which on her death was to be divided into separate trusts for each of the five children. Both the interest and the principal are available, if needed, for the support of the children and the principal is distributable at ages 25 and 30. The maternal grandparents are named as trustees

378

along with one James M. Goff. In addition, the children's mother was a partner in a business from which she had been paid $1,200 per month for some five years and which she had overdrawn about $25,000.

Nancy, with a commendable sense of understanding and moral responsibility, would keep the children together in the home they own in Champaign and where they had lived for eleven years. Nancy had been away from home attending school at Sacred Heart in Springfield for four years and for one year in college at Lincoln, Illinois. Clare had just completed her second year at Sacred Heart, wanted to complete her high school education in Champaign, did not want to go with her father, and felt that he had not displayed much interest in them. The father acquiesced in her request and the trial court properly respected the wishes of Nancy, Clare, and the father. Nancy too wanted to complete her education at the University of Illinois and we think there is sound reason for the order keeping the two girls together. In so stating, we do not intend to infer that the request of a minor child, standing alone, is necessarily either decisive or controlling on the question of custody even though sixteen years old. See Stickler v. Stickler, 57 Ill App2d 286, 206 NE2d 720, where this issue is met head on and appropriately applied. It is just one factor for consideration.

The other three children also expressed a reluctance to go with their father and a desire to remain in Champaign with Nancy. As was observed in Stickler, it would be an abdication of judicial responsibility to grant such a request willy-nilly. No matter with what linguistic niceties you may seek to clothe it, the stark, naked rule in this State, both legislatively proclaimed and judicially declared, is that the right of a natural parent to the custody of his minor child yields to no one unless it can be said that he has forfeited that right or unless the

379

"welfare" or "best interest" of the child or "good reason" exists to take that right away from him. Ill Rev Stats 1965, ch 3, ¶ 131. Giacopelli v. Florence Crittenton Home, 16 Ill2d 556, 158 NE2d 613; McAdams v. McAdams, 46 Ill App2d 294, 197 NE2d 93; Jayroe v. Jayroe, 58 Ill App 2d 79, 206 NE2d 266; People v. Jenkins, 34 Ill App2d 255, 180 NE2d 359; Kokotekian v. Kokotekian, 23 Ill App2d 171, 161 NE2d 712; Stalder v. Stone, 412 Ill 488, 107 NE2d 696; Nye v. Nye, 411 Ill 408, NE2d 300. To review each of these cases is to unduly extend this opinion. Suffice it to say that the terms "welfare," "best interest," "good reason," and "fitness" have been discussed and applied in a multitude of circumstances, a variety of relationships and, depending upon the type of proceedings, with varying emphasis. We would paraphrase McAdams when we say that we deal with a contest between one with a legal right to custody, unless we take it away from him, coupled with a legal duty to support and educate and one with no legal right to custody, unless she is awarded it, and no legal duty to educate or support. In this context, we box in "welfare," "best interest," "fitness," and "good reason" with the material, moral, and emotional qualities and responsibility of the parent together with the ability and willingness to give the care, affection and training which the parental relationship implies. We turn now to the picture painted in this record.

For an indeterminate period ranging in the testimony from six months after the divorce to a long time before the custody hearing, an itinerate sign painter moved into the home occupied by the mother and the children. The children admired and respected him, consulted him as to their problems and enjoyed his companionship and the things he did for them. There is no suggestion of immoral or improper conduct in his relationship with them. His exact status in the home remains in limbo. He did not testify. It seems clear that his presence did little

380

to encourage cooperation between the mother and father as to visitation rights—indeed an altercation between him and the father took place shortly before present litigation began. The trial court, on its own motion, ordered his effects removed from the home and directed him not to return pending the further order of the court. He moved next door.

The original divorce decree provided payments for child support at the rate of $400 per month with visitation on alternate Saturdays from 12 noon to 7:00 p. m., on alternate Sundays from 12 noon to 7:00 p. m. and for two weeks vacation in the summer. During 1961, there was apparently reasonable compliance with these provisions. In 1962, the father testified that visitation was denied him by the mother and the sign painter or both; that she was frequently intoxicated; would not admit him to the house and on many occasions had taken the children elsewhere when he was supposed to visit them; that Christmas and birthday cards were intercepted and not delivered to the children; that he discontinued payments in September, 1962, because of a denial of visitation and because he felt that the money was going for liquor and the painter; that he knew the mother had ample means; that judgment for the period covering September, 1962, to October, 1963, was entered and no payments were made on it; that Barbara called in October, 1964, and again in January, 1965, complaining of the mother's conduct; that the mother told him to come and get them; that he suggested it was in the midst of the school year and it ought to be deferred until the school was out; that the temporary court order in this case gave the father visitation rights and the right to take the three children out of the State upon posting a performance bond; that the bond was filed late and objections were filed to it although the plane tickets were there and available; that he did not go into court to enforce visita-

tion rights nor seek the custody of the children until after the mother's death; that he attended a dance with Nancy in 1962, at Sacred Heart and visited Barbara in the hospital in 1962. By her calls, Barbara, then the oldest child at home, considered her Dad a haven of refuge as late as January, 1965. His reaction to her request does not appear to be unreasonable at the time. ■ The mother is now gone. Her conduct is of little consequence except it might furnish a basis for the father's frustrations and his failure to exercise the rights and perform the duties that were his. The conduct of neither serves as a model for the conduct desired from divorced couples. The issue now is not what might or ought to have been done, but what must be done now. The omissions of yesterday are not necessarily the commissions of today nor the prophecy of tomorrow. It is unfortunate that the visitation of last summer did not materialize. From it might well have come the directional flags which the trial court sought. The trial court heard and saw the witnesses. His order and his findings ought not be disturbed unless against the manifest weight of the evidence. We cannot say that the conduct of this father amounts to an abandonment of his children or a forfeiture of his rights to their custody. Even if it may be said that he has been remiss in his duties, the opportunity to reform should be afforded him. Nothing in this record suggests that he cannot and should not assume his legal obligations as a parent and adequately supervise, control, and provide the parental guidance to which these children are entitled. Albeit she is willing, Nancy's life ought not be burdened with an obligation to her brothers and sisters which is presently secondary rather than primary. The trial court appropriately required both Nancy and the father to post bond for their faithful performance of their custodial duties. Should either fail in the responsibilities imposed by the decree, the trial court may exercise appropriate sanctions. In our

judgment, the order of the trial court is a proper resolution of a difficult situation and it is accordingly affirmed.

Affirmed.

TRAPP, P. J. and CRAVEN, J., concur.