294

*In re* ADOPTION OF SANDRA FAY BURTON.—(SAMUEL NEAL *et al.*,
Petitioners-Appellees, *v.* SANDRA FAY BURTON, a Minor, *et al.*,
Defendants-Appellants.)

Fifth District   No. 75-117

Opinion filed November 3, 1976.

JONES, J., dissenting.

Michael P. Seng, of Land of Lincoln Legal Assistance Foundation, Inc., of Cairo, for appellants.

Terry J. Foster, of Geittmann & Foster, of Metropolis, and William G. Schwartz, law student, for appellees.

Mr. PRESIDING JUSTICE KARNS delivered the opinion of the court:

Defendant Lily Mae Burton Badger, the natural mother of Sandra Fay and Martha Jean Burton, appeals from an order of the Circuit Court of Massac County finding her an unfit mother, and from that court's decree adjudging Sandra and Martha to be the adopted children of petitioners-appellees, Samuel and Freeda Neal. Mrs. Badger argues that her unfitness was not proved by clear and convincing evidence, and that the trial court's evidentiary rulings denied her a fair hearing. Although we feel that sufficient evidence of unfitness on one or more of the statutory grounds may have been presented below, we agree with appellant that the accumulation of errors requires a new trial.

In April 1968, Mrs. Badger's six children, including Sandra and Martha, were declared neglected minors under section 2—4 of the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, par. 702—4) after a hearing in the Circuit Court of Alexander County. Mrs. Badger, who was then eight months pregnant, testified that she was unable to attend the 1968 hearing because of a leg injury suffered in a beating by her estranged husband, Robert Burton. (Also a defendant in the instant case, Burton has not appealed from the trial court's finding of his unfitness.) Mrs. Badger sent her mother in her stead to request a continuance, which was not granted. She was not represented by an attorney, and was unaware that she might seek relief from the court's decision.

As wards of the court, the children were committed to the custody of the Illinois Department of Children and Family Services. The Department in turn placed Sandra and Martha in the foster care of the Neals, in whose home they have lived since October 1968. The girls were five and three years old, respectively, at the time they were adjudicated neglected. Now 12 and 10, they have lived most of their lives with the Neals.

The record reveals that Mrs. Badger married Robert Burton in 1955, when she was 14 years old. Between that time and April 15, 1968, the couple had seven children, six of whom were living as of the latter date. Mr. Burton abused his wife and children, and in late 1966 or early 1967 the couple separated because Mrs. Badger had reason to believe that he had sexually molested their oldest daughter, who was then 10 years old. After the separation, Mr. Burton continued to come to his wife's house and abuse her. On one occasion, he forced her to have sexual relations with

him, which encounter resulted in her becoming pregnant with the child she was carrying at the time of the neglect proceedings.

According to Mrs. Badger's uncontradicted testimony, her numerous early attempts to communicate with and regain custody of her children were frustrated by employees of the Department of Children and Family Services. She was denied visitation, and was told that she could not get her children back until she changed her circumstances. She was not told where the children had been placed. Her attempt to get relief from the Secretary of State's office was also unsuccessful.

In 1969, Mrs. Badger met Perry Badger and went to Georgia with him. She testified that she didn't feel at that time that there was anything more she could do toward regaining her children, but that she intended to return to Illinois. While in Georgia, she lived in a separate apartment in the same building with Mr. Badger, who supported her and her youngest child by Burton. They had sexual relations, and she had a child by him. They went through a marriage ceremony in Georgia although both of them were apparently still married to their previous spouses.

In 1971, Mrs. Badger returned to Illinois and finally managed to make contact with her children. During 1971 and 1972, two of her sons and one of her daughters were returned to her. Her other child apparently remained in a home for children with birth defects. In June 1972, visits began between Sandra and Martha and their mother.

By May 1973, according to caseworker Kathy Murrie, the Department had formulated a plan for the permanent return of Sandra and Martha to their natural mother. This plan was communicated to Mrs. Badger and to Mr. and Mrs. Neal. On November 14, 1973, the Department filed motions in Alexander County to vacate that court's prior placement orders; the motions stated the intention of the Department to return the two girls to Mrs. Badger. Although these motions were filed less than two months prior to the Neals' petition in the instant case, the Department, which was a named defendant, inexplicably took no position in its answer to the petition, praying only that the court "rule in accordance with existing law and the best interest of the minor children." Further, after the petition was filed, that agency permitted one of its employees to develop a "plan" for the girls directly contrary to the position of the Department before the Circuit Court of Alexander County. Apparently the hearing on these motions was continued in Alexander County pending the determination of the Neals' petition in Massac County.

The tension between the rights of natural parents and the welfare of their children is reflected in both the Adoption Act (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—1 *et seq.*) and the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, par. 701—1 *et seq.*). The Adoption Act declares that the child's best interests and welfare are "the prime consideration in all adoption

proceedings" and "of paramount consideration in the construction and interpretation of this Act." (Ill. Rev. Stat. 1975, ch. 4, pars. 9.1—15, 9.1—20a.) The Juvenile Court Act proclaims that "[t]he parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the best interests of the child." (Ill. Rev. Stat. 1975, ch. 37, par. 701—2(3)(c).) On the other hand, the Adoption Act requires parental consent to all adoptions unless the parents are found unfit on 1 of 12 enumerated grounds.[1] (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—8.) This requirement is also incorporated into the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, par. 705—9).

■■ The courts have paid a great deal of deference to a parent's "inherent right" to the society, care and custody of his or her own children. See, *e.g., In re Adoption of Vienup*, 37 Ill. App. 3d 217, 345 N.E.2d 742 (1st Dist. 1976); *Cormack v. Marshall*, 211 Ill. 519, 523-24, 71 N.E. 1077, 1078-79 (1904); *cf. Stanley v. Illinois* 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558, 92 S. Ct. 1208, 1212-13 (1972). This emphasis on parental "rights," with its echoes of the law of property, has not been without its critics. See, for example, H. Clark, The Law of Domestic Relations in the United States 631 (1968): "The child is treated like a chattel. The obligations of the parent to behave properly toward his child, and the child's needs for material and moral support and a stable environment all get short shrift." On the other hand, as Mr. Justice Barry cautioned, dissenting in the recent case of *In re Hrusosky*, 39 Ill. App. 3d 954, 960,

---

[1] The grounds specified, in section 1(D) of the Adoption Act (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—1D,) are:

"(a) Abandonment of the child;

(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare;

(c) Desertion of the child for more than 3 months next preceding the commencement of the Adoption proceeding;

(d) Substantial neglect of the child if continuous or repeated;

(e) Extreme or repeated cruelty to the child;

(f) Failure to protect the child from conditions within his environment injurious to the child's welfare;

(g) Other neglect of, or misconduct toward the child; provided that in making a finding of unfitness the court hearing the adoption shall not be bound by any previous finding, order, judgment or decree affecting or determining the rights of the parents toward the child sought to be adopted in any other proceeding except such proceedings terminating parental rights as shall be had under either this Act or the Juvenile Court Act [Ill. Rev. Stat. 1975, ch. 37, par. 701—1 *et seq.*];

(h) Depravity;

(i) Open and notorious adultery or fornication;

(j) Habitual drunkenness for the space of one year prior to the commencement of the adoption proceeding;

(k) Failure to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days after its birth;

(l) Failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child from his parents or to make reasonable progress toward the return of the child to his parents within twenty-four months after an adjudication of neglect under Section 2—4 of the Juvenile Court Act [Ill. Rev. Stat. 1975, ch. 37, par. 702—4]."

351 N.E.2d 386, 391 (3d Dist. 1976): "By someone's standards, it is always possible to find a better home for a child than the one Providence has bestowed." See also, to much the same effect, *McAdams v. McAdams*, 46 Ill. App. 2d 294, 299, 197 N.E.2d 93, 96 (4th Dist. 1964); *cf.* section 1—2 of the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, par. 701—2).

In their petition for adoption, the Neals alleged that Mrs. Burton was an unfit parent in that she had neglected the children repeatedly while they were living with her; abandoned them; failed to maintain a reasonable degree of interest, concern, or responsibility as to their welfare; failed to correct injurious conditions within their environment; made "no efforts whatsoever" to correct the conditions which were the basis for the removal of the children from her custody, and failed to make reasonable progress toward their return to her custody within 24 months of their adjudication as neglected.

At the hearing on the adoption petition, the Neals testified, *inter alia*, that the girls had been undernourished and seemed "starved for love" when they first came to them; that they never received any Christmas or birthday presents from Mrs. Badger; that on one occasion the girls had returned from a visit with the Badgers dirty and unkempt, and that one of them was bruised on her hips and face; and that they were upset when they had to visit with Mrs. Badger and were afraid they would not be allowed to return to the Neals.

Mrs. Badger testified that she had never injured any of the children; that she had prepared for the permanent return of the two girls by obtaining a larger home and the necessary furniture; that she had bought gifts for the girls after discovering their whereabouts; that she had not allowed Robert Burton to be with any of the children since 1968; and that she and Perry Badger had recently undergone blood tests so that they could become legally married, although they had not yet had time to get married. Her testimony was generally corroborated by Perry Badger, who expressed his willingness to accept Martha and Sandra into his home and to support them.

After the hearing, at which extensive testimony as to the home life of the Neals was received, the trial court found Mrs. Badger unfit on the grounds of failure to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare; desertion; depravity; and open and notorious adultery or fornication. Thus only one ground was both alleged in the petition and relied upon in the trial court's order. Absent other errors, we could nevertheless affirm if the evidence in the record supported the judgment, whatever the allegations or the reasons given by the trial court for its decision. (*In re Hrusosky*, 39 Ill. App. 3d 954, 959-60, 351 N.E.2d 386, 390 (3d Dist. 1976) (Stengel, J., specially concurring).) In fact, we could allow amendment of the petition in this court if it were

necessary. *Tiernan v. Stewart*, 33 Ill. App. 3d 545, 550, 338 N.E.2d 153, 156-57 (2d Dist. 1975), and cases cited therein.

The instant case exemplifies the "vexing problem" depicted by Mr. Justice Green in *In re Massey*, 35 Ill. App. 3d 518, 522, 341 N.E.2d 405, 408 (4th Dist. 1976):

> "* * * [A] child is required to be placed in foster care early in its life and remains there for several years. The child receives loving care from the foster parents, grows to love them and to relate to them as its real parents. Often, as here, the child needs special attention which the foster parents are especially suited to provide and the real parents, at least partly through misfortune, are not able to provide. Returning the child to its natural parents would be traumatic to the child. Under these circumstances, the best interests of the child would clearly be served by permitting it to be adopted. The parents, however, do not consent and are not shown by clear and convincing evidence to be unfit within the specific statutory provisions."

A predictable result of this recurring dilemma is the kind of cart-before-the-horse approach in which the compassionate trial judge finds that the best interest of the child requires that the child remain in the custody of the foster parents, which then necessitates an order finding the mother unfit. (See *In re Hrusosky*, 39 Ill. App. 3d 954, 959, 351 N.E.2d 386, 389 (3d Dist. 1976) (Stengel, J., specially concurring).) Under our system, however, with its doctrine of separation of powers, courts must defer to the legislature's clearly manifested formulation of social policy, whatever our own feelings about that policy, so long as it does not violate some constitutional proscription. Here, we think, a fair reading of the applicable statutes indicates clearly that the legislature contemplated that a finding of parental unfitness necessarily precede consideration of the best interests of the child.

■■ In any event, the court's erroneous rulings in petitioners' favor on the admission and exclusion of evidence denied Mrs. Badger a fair trial. However, because we believe that an outright reversal might result in overlooking what the legislature has directed should be our paramount consideration—the best interests and welfare of the children involved—we have decided to remand this case to the Circuit Court of Massac County for a new trial, and direct that it be tried before a different judge.

■■ To recount all the errors in detail would serve no useful purpose here, as we assume that they will not recur on remand; we will merely point out a few of the most significant ones. The certified copies of motions made by the Department of Children and Family Services in the Alexander County proceedings, seeking to vacate that court's prior

placement orders, were clearly relevant to show the official position of that agency only a short time prior to the adoption petition here, and should have been admitted. Mrs. Badger's fitness was in issue; thus the Department's motions, which presumably indicated that agency's determination that she was not then unfit, would have had some probative force.

Neither should the proffered testimony of Mrs. Badger about her conversations with various employees of the Department have been excluded: that testimony was offered not to prove the truth of the content of the conversations, and therefore hearsay, but to rebut the petitioners' allegations that Mrs. Badger had failed to maintain interest in Sandra and Martha. As our supreme court has defined it,

> "* * * 'Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' (McCormick, Law of Evidence, sec. 225; see also, Cleary, Handbook of Illinois Evidence, sec. 31.1 *et seq.*) * * *
>
> "The distinction between admissible testimony and that which is barred by the hearsay rule is well illustrated by Wigmore's example of the witness A testifying that 'B told me that event X occurred'. If A's testimony is offered for the purpose of establishing that B said this, it is clearly admissible * * *." *People v. Carpenter*, 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741 (1963).

■■ Mrs. Badger's alleged conversations with Cheryl Jeremiah of the Department of Children and Family Services, who inexplicably was not called to testify, would have had particular relevance in proving, not "the truth of the matters asserted" in those conversations, but that Mrs. Badger made timely efforts to regain her children. As the court said in *In re Taylor*, 30 Ill. App. 3d 906, 911, 334 N.E.2d 194, 197 (1st Dist. 1975), "where official acts prevent a parent from maintaining contact with a child, unfitness under the Adoption Act cannot be proven by such lack of contact standing alone." *Cf. Peyla v. Martin*, 40 Ill. App. 3d 373, 352 N.E.2d 407 (5th Dist. 1976); *In re Hrusosky*, 39 Ill. App. 3d 954, 351 N.E.2d 386 (3d Dist. 1976) (Barry, J., dissenting); *In re Overton*, 21 Ill. App. 3d 1014, 316 N.E.2d 201 (2d Dist. 1974).

Most fundamentally, however, we think that the scope of the evidence received went beyond that material to the determination of fitness. All the evidence concerning the home life of the Neals was clearly irrelevant to the question of Mrs. Badger's fitness, and should not have been permitted in the initial hearing on that question, where it could only be prejudicial. The primary issue in the hearing mandated by section 13 of the Adoption Act (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—13) is the validity of the parent's

consent to the adoption. Where the parent does not consent, as here, he or she must be determined unfit within the statutory definition. (Ill. Rev. Stat. 1975, ch. 4, pars. 9.1—8, 9.1—1D; ch. 37, par. 705—9.) Only after proof of the existence of one of the statutory conditions precedent to adoption—either consent or unfitness—can the court properly consider the best interests of the child. *In re Jones*, 34 Ill. App. 3d 603, 340 N.E.2d 269 (1st Dist. 1975); *Kubisz v. Johnson*, 29 Ill. App. 3d 381, 329 N.E.2d 815 (4th Dist. 1975); *Shuman v. Shuman*, 22 Ill. App. 3d 151, 319 N.E.2d 287 (3d Dist. 1974).

■■ Petitioner argues that to exclude evidence concerning the prospective adoptive environment would be to ignore the best interests and welfare of the child, declared by the legislature to be of "paramount consideration" in the construction and interpretation of the Adoption Act. (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—20a.) We cannot agree. The statute explicitly requires consent in all cases, absent a finding of unfitness (or mental illness or retardation, not in issue here). (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—8.) It has long been settled in this State, and courts have so held both before and after the addition of section 20a to the Adoption Act in 1973,[2] That the steps taken in an adoption proceeding are subject to the most careful judicial scrutiny, and that to justify termination of a natural parent's rights, unfitness must be established by clear and convincing evidence. (See, *e.g.*, *Peyla v. Martin*, 40 Ill. App. 3d 373, 352 N.E.2d 407 (5th Dist. 1976); *In re Grant*, 29 Ill. App. 3d 731, 331 N.E.2d 219 (1st Dist. 1975); *Thorpe v. Thorpe*, 48 Ill. App. 2d 455, 198 N.E.2d 743 (4th Dist. 1964).) Absent consent or a finding of unfitness, an adoption cannot be granted solely on the basis of a child's best interest and welfare. *Culkin v. Culkin*, 30 Ill. App. 3d 1073, 333 N.E.2d 698 (4th Dist. 1975); *In re Cech*, 8 Ill. App. 3d 642, 291 N.E.2d 21 (1st Dist. 1972); *In re Smith*, 4 Ill. App. 3d 261, 280 N.E.2d 770 (1st Dist. 1972).

Petitioners cite *Giacopelli v. Florence Crittenton Home*, 16 Ill. 2d 556, 158 N.E.2d 613 (1959), for the proposition that the natural parents need not be found unfit as a condition precedent to the consideration of whether adoption is in the best interest of the child. *Giacopelli*, however, was a habeas corpus case: the issue there was *custody*, not a final termination of parental rights. See *In re Smith*, 4 Ill. App. 3d 261, 264-65, 280 N.E.2d 770, 773 (1st Dist. 1972).

Adoption is a much more serious matter than a mere temporary change of custody. (*In re Jones*, 34 Ill. App. 3d 603, 340 N.E.2d 269 (1st Dist. 1975).) As the court said in *Jackson v. Russell*, 342 Ill. App. 637, 639, 97 N.E.2d 584, 585 (3d Dist. 1951):

---

[2] Note that the present Adoption Act has, since it came into effect in 1960, contained the very similar provision that "[t]he welfare of the child shall be the prime consideration in all adoption proceedings." Ill. Rev. Stat. 1975, ch. 4, par. 9.1—15.

"* * * The welfare of the child is a much more appropriate yard stick in a custody case than in an adoption matter. Adoption * * * affects the course of inheritance, deprives the child of a place in which it was placed by nature, and by force of law thrusts the child into another relationship, while severing forever and conclusively the legal rights and interests of the natural parents, * * *."

The Adoption Act by its terms emphasizes the finality of an order terminating parental rights or the entry of a decree of adoption:

"* * * [T]he natural parents * * * shall be relieved of all parental responsibility for such child and shall be deprived of all legal rights as respects the child, and the child shall be free from all obligations of maintenance and obedience as respects such natural parents." Ill. Rev. Stat. 1975, ch. 4, par. 9.1—17.

As we read the Adoption Act, it contemplates a two-step process: first, the filing of a petition, followed as soon as possible by a hearing, and then, if consent or unfitness is found, the entry of an interim order; second, ordinarily after a six-month waiting period, the final decree of adoption. (Ill. Rev. Stat. 1975, ch. 4, pars. 9.1—13, 9.1—14.) On remand, therefore, the court should confine its initial hearing to the issue of whether Mrs. Badger's parental rights should be terminated, and should exclude evidence as to the home life of the Neals. If clear and convincing evidence of unfitness on one or more of the grounds specified in the Adoption Act (Ill. Rev. Stat. 1975, ch. 4, 9.1—1D) is not forthcoming, the petition should be denied. Only if unfitness is proved should the court proceed with its consideration of evidence relevant to the question whether adoption by the Neals is in the best interests of Sandra Fay and Martha Jean Burton.

It should be noted that even if there is no proof of unfitness on remand, Mrs. Badger will not automatically regain custody of her children. They remain wards of the Alexander County Circuit Court, which retains jurisdiction over them. (Ill. Rev. Stat. 1975, ch. 37, pars. 705—2(3), 705—11.) Mrs. Badger could, of course, apply to the court for restoration of custody, in which event the best interests of the children would be controlling. Ill. Rev. Stat. 1975, ch. 37, pars. 705—8(2), 701—2(3)(c).

For the reasons given, the case is reversed and remanded to the Circuit Court of Massac County, with directions.

Reversed and remanded with directions.

G. J. MORAN, J., concurs.

Mr. JUSTICE JONES, dissenting:

I cannot agree with the opinion of the majority in this case that there may have been sufficient evidence presented below to prove the unfitness

of Lily Mae Burton Badger under one or more of the statutory grounds of unfitness. In my opinion, the evidence in fact showed Lily Badger to be a fit and proper person to have custody of her two daughters, Sandra Fay Burton and Martha Jean Burton. To remand this cause for a new trial is to unconscionably delay the reuniting of this fit parent with her children. I feel that the interim order determining Lily Badger to be unfit and the decree of adoption should be reversed outright.

The evidence presented in this case showed that at all times after her six children had been taken from her custody, Lily Badger made continuous efforts to visit all of the children and to regain their custody. Unlearned in the law and unrepresented by counsel, she wrote to the Secretary of State not long after the removal of the children. After obtaining no assistance from that office, she contacted Cheryl Jeremiah, a caseworker with the Department of Children and Family Services, several times and asked that arrangements be made for her to visit the children. This caseworker refused to tell her where the children had been placed and did not arrange for the requested visits. After Lily Badger had eventually located her oldest daughter, Mary Ann, at Hurst Bush and visited with her, she was told by Cheryl Jeremiah not to contact Mary Ann again. Additionally, Lily Badger made several long distance calls to Hurst Bush about her children; but her calls proved fruitless.

It was only after these efforts on the part of Lily Badger that she moved to Georgia in 1969, and at the time she left Illinois she had no intention of leaving her children. Sometime in 1970 she again called Hurst Bush and was advised that her oldest daughter was no longer there. In June of 1971 she returned to Illinois with the intention of trying to regain custody of her children. She contacted Cathie Murrie, a caseworker with the Department of Children and Family Services, in order to locate her children and within two days of Lily Badger's return to Illinois had a visit with Cathie Murrie. She also contacted Karen Craig, another caseworker. Through these contacts, Lily Badger was reunited with at least five of the children who had been removed from her. (It is not clear from the record whether contacts with Lily Badger's third oldest daughter, Lisa, who had been placed in a children's home for children with birth defects, were arranged.) After several visits, Mary Ann, Timmy, and Roger were returned permanently to the custody of Lily Badger. Sandra and Martha were also brought to Lily Badger for three or four visits. After July of 1973 there were no further visits between these two girls and their natural mother; however, the lack of further visits was not the result of any failure on the part of Lily Badger. Visits were arranged during that period, but they had to be cancelled because of illnesses of Martha and Sandra.

Although there may have been valid reasons for the removal of the six children in 1968, those reasons did not exist when the Neals' petition was

filed. Lily Badger no longer had any contact with her former husband, Robert Burton. She had obtained suitable housing and the necessary furniture for the return of her children; and she showed herself to be a good housekeeper and appeared to have a "good relationship" with her children. The changes in Lily Badger were described by Cathie Murrie, a caseworker who had had nearly 200 contacts with Lily Badger between June of 1971 and the time the Neals' petition was filed, as being "dramatic." Additionally, Lily Badger had the means to support all of her children through Perry Badger, the man with whom she was to be wed and with whom she had already entered into a wedding ceremony in the mistaken belief that her first husband had obtained a divorce.

It is beyond dispute that the Department of Children and Family Services recognized the parental fitness of Lily Badger at the time the Neals' petition was filed. That agency had already returned permanently to Lily Badger three of the six children previously taken from her, namely, Mary Ann, Timmy and Roger. And some two months before the Neals' petition was filed, that agency had begun court proceedings in another county in order to permanently return custody of Martha and Sandra to Lily Badger. It was only through some utter lack of responsibility that that agency postponed the court action it had brought with respect to returning Martha and Sandra to their mother and inexplicably took a neutral position in the action brought by the Neals, simply asking the court to "rule in accordance with existing law and the best interest of" Sandra and Martha. It is difficult to conceive how an agency responsible for the welfare of children can conduct themselves in such an irresponsible, even perfidious, manner. Perhaps, though, it can be partially explained and understood when it is considered that the "child placement expert" of the Department who recommended that Sandra and Martha stay with the Neals (after the other children had been returned to their admittedly fit mother by the Department) arrived at her decision *without ever interviewing the mother or visiting her home!*

In my opinion the evidence was not sufficient to prove Lily Badger unfit, but, in fact, it proved her fitness. Thus this case should end here, and the Department of Children and Family Services should resume its court proceedings in order to accomplish the return of permanent custody of Sandra and Martha to Lily Badger. I, therefore, dissent.