*In re* ANNETTE MASSEY, a Minor.—(JACK CHICK, Probation Officer of De Witt County, Petitioner-Appellee; *v.* EARL MASSEY *et al.*, Respondents-Appellants—(RICHARD S. LAYMON, Guardianship Adm'r of the Department of Children and Family Services; Respondent).)

Fourth District No. 12997

Opinion filed January 29, 1976.

Herrick, Rudasill & Moss, of Clinton (Ray Moss, of counsel), for appellants.

Robert G. Gammage, State's Attorney, of Clinton (Kenneth E. Baughman, Assistant State's Attorney, and Michael M. Schneider, Law Student, of counsel), for appellee.

Mr. JUSTICE GREEN delivered the opinion of the court:

On October 7, 1968, Annette Massey, then a 10-week-old infant, was declared to be a neglected child by the Circuit Court of De Witt County. A representative of the State Department of Children and Family Services was appointed guardian of her person with power to place. On August 10, 1971, Earl Massey and Rose Massey, parents of the child, petitioned that court to have the child returned to their custody. After hearing, their petition was denied. On August 7, 1974, an amended petition by Jack Chick, Probation Officer of De Witt County, was filed requesting that the guardian be given power to consent to the adoption of the child. After a hearing where the parents were represented by court appointed counsel and the child by a guardian ad litem, the prayer of the petition was granted. The parents appeal.

The order entered on October 7, 1968, found the child to be "neglected" as defined in section 2—4 of the Juvenile Court Act (Ill. Rev. Stat. 1967, ch. 37, par. 702—4) in that she was "neglected as to proper medical care and other care necessary for her well-being." Then, as now, that section provided that a minor under 18 years old who was neglected "as to proper or necessary support * * * or as to medical or other remedial care * * * or other care necessary for his well-being * * *" is a neglected minor. Section 5—9(2) of the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, par. 705—9(2)) states that the court may, if it finds it to be "in the best interests of the minor," authorize a guardian of the person of a minor to consent to the adoption of that minor if both parents consent to giving the guardian such power or if any nonconsenting parent is found to be "unfit." The section further states that unfitness is defined as provided by the Adoption Act (Ill.

Rev. Stat. 1973, ch. 4, par. 9.1—1 *et seq.*). Section 1D of the Adoption Act defines the following as being among the grounds for finding a parent to be unfit:

"(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare;

\* \* \*

(f) Failure to protect the child from conditions within his environment injurious to the child's welfare;

\* \* \*

(l) Failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child from his parents or to make reasonable progress toward the return of the child to his parents within twenty-four months after an adjudication of neglect under Section 2—4 of the Juvenile Court Act."

The instant amended petition was brought under the stated provisions of the Juvenile Court Act and the Adoption Act and alleged that the parents were unfit on the grounds of subsections (b), (f), and (l) of section 1D. The allegation with reference to subsection (f) stated that the parents "evince conduct that would fail to protect the child from conditions within her environment injurious to the child's welfare." The order of the court empowering the guardian to consent to adoption found the parents to be "unfit persons" within the meaning of subsections (b), (f), and (l) of section 1D of the Adoption Act and also found that it was to the best interests of the child that the guardian be authorized to consent to the child's adoption.

Since shortly after the original decree finding the child to be neglected, she had been living with a foster family at Saybrook in McLean County. The foster mother testified that they would like to adopt the child if permitted to do so. The natural parents were permitted visitation every other Sunday during the early years of the foster care and on one Sunday per month thereafter. The mother visited the child a total of six times during the first 3 years and more often, probably as much as every other month during the last 3 years. The father visited less frequently. The visits, which lasted for about one hour in the home of the foster parents, were usually very unhappy occasions. The child showed dislike for the natural mother and often tried to hide to avoid the visit. In the early years the natural mother tried to get the child to sit on her lap but the child resisted and fought to get away. After the visits the child wet the bed and had nightmares.

No physician testified but there was evidence that the child had respiratory problems with excessive colds and had trouble with a kidney infection. Problems of an emotional nature appeared to be of greater

concern. Dr. Robert A. Hogan, a child psychologist, testified that he had examined the child and found her to be in the dull normal range of intelligence and extremely immature and dependent upon her foster mother. He stated that the child had a very close relationship with the foster mother and had great need for a home with such relationship. He testified that in his opinion, the removal of the child from foster home and mother, the only home and mother she had known, would be very traumatic and detrimental to the child. The evidence was fully sufficient to support the finding by the court that the best interests of the child were served by granting the guardian power to consent to the child's adoption.

■■ The rule is firmly established that in a proceeding for the custody of a child, the best interests of the child is the predominate issue but that in a proceeding such as this where the rights and interests of a parent are sought to be permanently severed, the best interests of the child can be considered only if the court finds by clear and convincing evidence that the parent is unfit or consents to the severance (*In re Petition to Adopt Shuman*, 22 Ill.App.3d 151, 319 N.E.2d 287; *In re Petition to Adopt Cech*, 8 Ill.App.3d 642, 291 N.E.2d 21; *In re Deerwester*, 131 Ill.App.2d 952, 267 N.E.2d 505). The judge found both parents to be unfit. The fact that he pronounced in open court his findings of the child's best interests prior to pronouncing his findings as to unfitness did not violate the rule or constitute error.

The evidence to support the finding of unfitness for failure to maintain a reasonable degree of interest, concern and responsibility for the child's welfare under section 1D(b) was the failure of the parents to visit the child more often. While the child was at Saybrook, the parents lived at various places in De Witt County and at Maroa in Macon County. The mother said she did not visit more often because of lack of transportation and once because of a problem with her teeth. The father did not testify or appear at the hearing. The trial judge recognizing the near poverty condition of the family stated that he considered their lack of visitation as "some slight failure to maintain interest and concern." In *Deerwester* a mother had similar difficulties due to lack of transportation to make visits to children placed 80 miles from where she lived. This court found the evidence to be insufficient to sustain a finding of unfitness and reversed. In the instant case the evidence of failure to visit was also insufficient, of itself, to support a finding of unfitness.

The court also found that the parents were unfit under section 1D(f). That provision speaks of the failure of the parent to protect the child from injurious conditions within his environment. The original decree was for neglect of the child as a baby. Since the child has been in a

foster home for the past 6 years, the parents could not have failed to protect it during this time. The allegations of the petition were phrased not in terms of protection that the parents had failed to furnish but of "conduct that would fail to protect" in the future. We believe the evidence considered by the trial court as to this ground is more related to subsection (*l*) of section 1D.

Subsection (*l*) of section 1D of the Adoption Act was added by Public Act 78—854, effective October 1, 1973. Absent this provision, this case might well illustrate a situation which often happens when a child is required to be placed in foster care early in its life and remains there for several years. The child receives loving care from the foster parents, grows to love them and to relate to them as its real parents. Often, as here, the child needs special attention which the foster parents are especially suited to provide and the real parents, at least partly through misfortune, are not able to provide. Returning the child to its natural parents would be traumatic to the child. Under these circumstances, the best interests of the child would clearly be served by permitting it to be adopted. The parents, however, do not consent and are not shown by clear and convincing evidence to be unfit within the specific statutory provisions. The situation presents a most vexing problem. Subsection (*l*) evidences a legislative recognition of the problem and an intention to give greater protection to the best interests of the child.

The petitioner, here, concedes that the portion of subsection (*l*) referring to failure to make reasonable progress toward the return of the child within 24 months after adjudication can have no application to this case. He relies on the provision of subsection (*l*) making "[f]ailure to make reasonable efforts to correct the conditions which were the basis for the removal of the child" a ground of unfitness. The reasons for the removal of the child as stated in the original decree were that she was "neglected as to proper medical care and other care necessary for her well-being." Petitioner, Chick, testified as to the conditions at that time. He testified that he visited the parents at their home which was then in Weldon in De Witt County. He found dirty clothes in the living room, floors cluttered with dirt; clothing and dirty diapers. Garbage had been in the kitchen for some time. The child who is the subject matter of this petition was unhealthy and sickly looking and had diaper rash. He took the child to a doctor who later became the original petitioner. Rose Massey, the child's mother testified that after the child's birth, she was ill with some sort of female trouble which is better now. She stated that her husband was a garbage collector and that she salvaged clothing from the refuse he collected, cleaned it, mended it and either used the clothing for the family or gave it away. It was clear

from this evidence that the original neglect arose from more than the mother's temporary illness.

John Schlepper, a welfare worker with the Department of Children and Family Services, testified that since January, 1973, he had visited the parents' home, which was then in Maroa in Macon County, approximately 20 times, the most recent being on July 30, 1974. Mr. and Mrs. Massey and two children, slightly older than Annette, lived in an apartment over a tavern. He described the apartment as dirty with piles of clothing and debris all over the house. He could see no improvement in Mrs. Massey's housekeeping during the time of his visits. The apartment was otherwise adequate. He testified that he had attempted to get Mrs. Massey to attend sessions of a group in Decatur that was designed to help mothers improve their housekeeping and child caring skills. After attending once Mrs. Massey dropped out and he could not persuade her to go back. He also stated that a teacher of Steve Massey, one of the children, told him that Steve had been troubled with chronic colds and suggested that the boy see a doctor about his tonsils. The witness said that he passed this information along to Mrs. Massey. The evidence is confused as to when the boy did see a doctor. Mrs. Massey stated that she took him to a doctor when he cut his foot and the doctor said that the tonsils required no treatment. Under the evidence, however, the trial court could have found that the boy did not visit the doctor until 17 months after the request. This evidence was apparently offered to show that Mrs. Massey had not changed her habits of procrastinating in seeking medical advice for the children. The essence of section 1D(*l*) is that the parents whose child has been taken from their custody to protect the child are unfit if they do not make reasonable efforts to change themselves and their circumstances so that they can give the child the care it needs. If they fail to do this adoption of the child should be permitted *if the child's best interests so require.* Because of her physical and emotional problems, the care that Annette would need was great.

The Masseys had not given Annette adequate medical care as a baby. Had the Masseys changed in this respect? The court could have found that when advised by a social worker that a son might need medical attention Mrs. Massey virtually disregarded the advice. The home had been dirty and cluttered. Had the condition of the home changed? The evidence indicated that it was still cluttered and somewhat dirty but not as dirty. The child has respiratory problems that would undoubtedly be increased by a dirty, moldy living quarters. When offered a chance to be instructed in homemaking, Mrs. Massey did not follow through. The court could have found by clear and convincing evidence that the

mother, Mrs. Massey, had not made reasonable efforts to enable herself to now be able to give proper care to the physical needs of the child.

The evidence is sufficient to show that Annette's emotional needs were also not receiving proper care at the time of the original finding of neglect. What had the parents done to prepare themselves to now meet those needs of this immature child? In order to be parents of the child, it would be necessary to become well acquainted with her. The trial judge stated that he considered the parents' record on visitation to constitute a "slight failure." While Mrs. Massey had no driver's license and did not drive a car, her husband had a license and did drive. The evidence would indicate that they had a car during the time that subsection ($l$) was in force. The visitation day was Sunday and there was no evidence that Mr. Massey had to work on that day. There is no evidence that Mrs. Massey attempted to persuade him to visit or that he attempted to persuade her. They were people living at the poverty level and it was, no doubt, difficult for them to travel but since they had an automobile, the added expense of traveling from Maroa to Saybrook and back, once a month, a round trip distance of 90 miles was not insurmountable. The evidence of the failure to visit the child, although insufficient in itself to constitute unfitness, may be considered together with the other evidence as bearing on the reasonable efforts of the Masseys.

■■ We believe that subsection ($l$) was enacted to meet the situation shown by the evidence in this case. Under the evidence presented the trial judge could have found that it was clearly and convincingly shown that since the effective date of subsection ($l$) the Masseys have failed to make reasonable efforts to prepare themselves to give the child the care that she did not receive as a baby and would need if returned home. The evidence introduced bore more directly on the mother than the father, however, it is clear that he visited the child even less than the mother and there is no showing that he did anything to change the physical condition of the home.

The judgment of the Circuit Court of De Witt County is affirmed.

Affirmed.

CRAVEN, P. J., and SIMKINS, J., concur.