NEW JERSEY DIVISION OF YOUTH AND FAMILY SER-
VICES, PLAINTIFF, v. STEPHEN AND JOAN BARDUSCH
HUGGINS, DEFENDANTS.

Juvenile and Domestic Relations Court
Camden County

January 27, 1977.

Mr. *Murray Sufrin* and Mr. *James Herman* for defendant parents (*Messrs. Sufrin* and *Herman,* attorneys).

*Mr. Norman Rosenblum* and *Ms. Patty Ann Murphy,* of the office of the Public Advocate for Anne Marie, Stephen, Joel, Raymond and William David (*Mr. Stanley Van Ness,* Public Advocate, attorney).

*Mr. Samuel Natal* for Joan, Bertha and Charles.

*Mrs. Shirley Tolentino* and *Mr. William Mild, III,* Deputy Attornies General, for the Division of Youth and Family Services, Department of Human Services. (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

PAGE, P. J. J. D. R. C.  This action involves allegations of child abuse and neglect of eight children by their natural parents, defendants Stephen and Joan Huggins. It was originally brought by the Division of Youth and Family Services (Division) under the Dodd Act, *N. J. S. A.* 9:6–8.21 *et seq.* On April 15, 1976 this court issued an interim order permitting the Division to petition for guardianship, pursuant to *N. J. S. A.* 30:4C–15(c), 20. The Division subsequently filed a complaint for guardianship requesting permanent termination of parental rights with regard to five of the children, Anne Marie, age–13, Stephen, age–12, Joe, age–5, Raymond, age–4 and William David, age–2. The Division is also seeking protective custody of the three remaining in the home, Charles, age–10, Joan, age–9 and Bertha, age–8.

The Huggins family has had extended involvement with the court system. In November 1972 they moved from Philadelphia, Pa. to Collingswood, N. J. to avoid the jurisdiction of the Philadelphia Family Court, which was investigating police and welfare department records of severe neglect and abuse of the Huggins children. The Huggins children were left under the care of the grandparents, the Bardusches and a maternal aunt.

While living in the Bardusch household the children were subject to physical abuse and extreme clutter and filth, including both animal and human waste throughout.

Charles and Anne Marie ran away frequently. On January 18, 1973 they spent the night in a garage and were picked up by the police on their way to school. They were hospitalized for frostbite and exposure. Five days later all six Huggins children were removed by court order and placed in foster homes under the care and custody of the Division.

Subsequent examination of the children revealed multiple evidence of child abuse and neglect, including bruises, open sores, decubitus ulcers, emaciation, emotional deprivation and delay in motor development, toilet training and other social skills.

The Division tried to work with the parents. They cooperated briefly, until the return of their children. However, the caseworkers had to continue to prod the parents to properly feed and provide medical care for their children. By August, homemaker services had been terminated due to the Huggins' hostile, resistant attitude.

Despite their efforts to work closely with Mr. and Mrs. Huggins, the Division caseworkers were not able to alter the previous pattern of parental neglect and abuse. By September 1975 the situation was severe. Stephen, Jr. had been charged with incorrigibility and petty larceny by his father, and detained in the children's shelter, from which he was placed in foster care where he remains today. The Division insisted that Mrs. Huggins take Joel, Raymond and William David to a pediatrician, who diagnosed them as malnourished due to improper diet.

On September 16, 1975 the Division filed a child abuse neglect complaint pursuant to *N. J. S. A.* 9:6-8.21 *et seq.*, against the parents with regard to Joel, Raymond and William David. On September 20, 1975 Anne Marie ran away, was apprehended by the police, and placed in foster care since Mrs. Huggins wouldn't take her back.

There is substantial evidence that the children had deteriorated both physically and socially while living with their biological parents. Consequently, on February 18, 1976 the Division moved to amend the complaint filed pursuant to

*N. J. S. A.* 9:6–8.21 *et seq.,* to include Charles, Joan and Bertha. This court issued an order allowing the three children to stay with their parents as long as the Hugginses allowed the Division to strictly supervise their care, which included providing access to the home at any time.

On August 11, 1976, based on uncontested testimony that Division caseworkers were being denied access to the Huggins' household, this court ordered the temporary removal of Charles, Joan and Bertha. On August 19, 1976 these three children were returned to their parents' custody subject to strict supervision by the Division. On October 26, 1976 this court appointed a law guardian for Stephen, Jr. On November 9, 1976 the court heard testimony regarding the Huggins' inability to adequately supervise Stephen, Jr.

From the review of all the testimony, reports, exhibits and other evidence presented in this complex case, certain factual determinations must be made.

The court finds that the natural father, Stephen, Sr., has borderline mental abilities, compounded by a serious speech defect. The natural mother, Joan Bardusch Huggins, is definitely retarded and has suffered from severe emotional disturbances which have resulted in her past hospitalization. Although the Hugginses love their children, their history indicates both an inability and an unwillingness to adequately care for and supervise all eight children at the same time.

All eight Huggins children have suffered from neglect and abuse in various degrees. Each child has shown the effects of malnutrition, caused both by deprivation of food as well as improper diet. Each child has been exposed to unsanitary conditions. Each child has demonstrated the effects of emotional neglect and "failure to thrive" emotionally and socially, as well as physically.

Additional factual determination as to the present status of each child must be made. The three youngest children, Joel, age 5, Raymond, age 4 and William David, age 2, have been in foster care placement with separate families continuously since September 1975. As a result of this con-

tinuous relationship in loving and nurturing families, each child now relates to his foster parents as his "psychological" parents. Raymond, Joel and William David would suffer irreversible damage if removed from their present homes and returned to their biological parents. Each boy has shown substantial gains physically, emotionally and socially, in his present home. Moreover, the present foster parents of Raymond, Joel and William David have asserted their willingness to adopt each boy and provide a permanent and stable family.

Stephen Huggins, Jr., age 12, has shown remarkable progress, physically, mentally and socially, since his last foster placement by order of this court in September 1975. He has advised the court that he does not wish to return to live with his biological parents.

Anne Marie, age 13, continues to suffer from a serious emotional disturbance. She has not had the stability of one long-term foster placement to date. Anne Marie has requested that this court not consider her return to her biological parents.

The three remaining children at home, Charles, age 10, Bertha, age 9 and Joan, age 8, are presently coping, under close supervision of the Division. They are apparently now being adequately fed and clothed. While their home conditions have improved, Charles still shows signs of considerable emotional disturbances and acting-out in his home and school. He is presently in need of psychotherapy.

All eight Huggins children are clearly in need of protection by this court.

As early as 1880 New Jersey enacted legislation for the protection of children which provided for the permanent termination of parental rights. "An act to protect children from neglect and cruelty, and relating to their employment, protection and adoption," *L.* 1880, p. 124.

The legislation presently in effect sets out *four* classes of children for whom permanent termination of parental rights may be sought. They are:

(a) A child whose parents, guardian or custodian has been convicted of abuse, abandonment, neglect or cruelty under *N. J. S. A.* 9:6–1 *et seq.*,

(b) A child who has been adjudicated delinquent,

(c) A child under the care and custody of the Division whose "best interests" require that he be placed under guardianship, or

(d) A child placed in foster care whose parents have failed to maintain their parental responsibilities. *N. J. S. A.* 30:4C–15 (c),(20).

In actions for permanent termination of parental rights the court must base its decision on the "best interests" or the welfare of the child. *N. J. S. A.* 30:4–C–15, 20. "Even parental rights must yield to this principle." *In re Mrs. M.,* 74 *N. J. Super.* 178 (App. Div. 1962). The best interests standard has been defined as the "safety, happiness, physical, mental and moral welfare of the child." *Sheehan v. Sheehan,* 51 *N. J. Super.* 276, 291–92 (App. Div. 1958). In such cases, determination of the "best interests" of the child is to be made on the basis of the facts and circumstances of each case. *Fantony v. Fantony,* 21 *N. J.* 525, 537 (1956).

In *Sheehan v. Sheehan,* 51 *N. J. Super.* 276 (1958), the Appellate Division stated:

> The preference of a young child has a place in the determination of custody, but is not conclusive. * * * The court will look at the 'character, condition, habits and other surroundings' of the parents in considering their fitness and the welfare of the children. [at 291]

In the present case the oldest children, Stephen and Anne Marie, have testified that they do *not* wish to return to their natural parents. Similarly, Joel, Raymond and William David have clearly shown their preference to remain with their foster parents.

Children may be taken out of their parents' custody even without a specific finding of unfitness. *S.M. v. S.J.,* 143 *N. J. Super.* 379 (Super. Ct. 1976). However, an important consideration before permanently terminating rights of natural parents to their children is a finding that

* * * the child's 'best interests' will be *substantially prejudiced* if he is permitted to remain with his parent — *e. g.*, that his health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change, or that the parent is in some way *incapable of caring for the child or unwilling to do so.* [*In re Cope*, 106 *N. J. Super.* 336, 341 (App. Div. 1969). (Emphasis supplied.)]

Legislative and judicial policy has dictated that the child's "best interests" should be protected "so far as practicable" by providing welfare services to support and maintain the integrity of the biological family as a living unit. It is clear in the case at bar that all welfare services, including homemakers, caseworkers, medical treatment, etc., have been provided to the Huggins family with little or no success.

In addition to a past history of abuse and/or neglect, parental inability or unwillingness to change is a common reason for taking away custody rights. *State v. Loomis,* 195 *Neb.* 552, 239 *N.W.* 2d 266 (Sup. Ct. 1976). See *In re D.T.,* 237 *N. W.* 2d 166 (So. Dak. Sup. Ct. 1975), *Moreland v. State,* 531 S.W. 2d 229 (Tex. Civ. App. 1975). "Stagnation in parental capacity" to care for children, or a "prospective inability for improvement", has been cited as grounds for permanent termination of parental rights. *In re Certain Neglected Children,* 134 *Vt.* 74, 349 A. 2d 228 (Sup. Ct. 1975). *In re J. & J.W.,* 365 A. 2d 521 (Vt. Sup. Ct. 1976). In *Teeter v. Pruiksma,* 47 *A. D.* 2d 101, 364 N. Y. S. 2d 656 (1975) a mother who would require 10 to 12 years of psychiatric treatment to change, if ever, was deprived of custody of her child. See *In Re. D.T.,* 237 N.W. 2d 166 (S. Dak. Sup. Ct. 1975); *Moreland v. State,* 531 *S.W.* 2d 266 (Tex. Ct. of App., 1st Dist. 1975).

The significance of "psychological parenthood" is gaining recognition as an important factor in determining custody based on the "best interests" standard. *In Re Adoption of J.,* 139 *N. J. Super.* 533 (1976); *see also, In re P, and wife,* 114 *N. J. Super.* 584 (App. Div. 1971).

Courts throughout the country have applied the principles first enunciated in *Goldstein, Freud and Solnit, Beyond the Best Interests of the Child* (at 4, 17). The authors state:

In giving meaning to this goal [best interests] decision-makers in law have recognized the necessity of protecting a child's physical well-being as a guide to placement. But they have been slow to understand and to acknowledge the necessity of safeguarding a child's psychological well-being. While they make the interests of a child paramount over all other claims when his physical well-being is in jeopardy, they subordinated, often intentionally, his psychological well-being to, for example, an adult's right to assert a biological tie. Yet both well-beings are important and any sharp distinction between them is artificial. * * * [F]or the child, the physical realities of his conception and birth are not the direct cause of his emotional attachment. This *attachment results from day-to-day attention to his needs for physical care, nourishment, comfort, affection, and stimulation.* Only a parent who provides for these needs will build a psychological relationship to the child on the basis of the biological one and will become his "psychological parent" in whose care the child can feel valued and "wanted." [Emphasis supplied]

Their psychoanalytic theory indicates that children need "unbroken continuity of affectionate and stimulating relationships with an adult." (At 6). Moreover, placement decisions should reflect the child's sense of time:

Unlike adults who measure the passing of time by clock and calendar, *children have their own built-in time sense,* based on the urgency of their instinctual and emotional needs. This results in their marked intolerance for postponement of gratification or frustration, and an intense sensitivity to the length of separations. [at 11; Emphasis supplied]

It is clear that four out of five Huggins children who have been removed have developed strong psychological parent ties to the adults who are presently nurturing them. Only Anne Marie, 13, who has severe emotional difficulties, has been unable to form this close relationship with an adult.

The time factor is most important when considering Joel, 5, Raymond, 4, and William David, 2. Their memory and attention have resulted in the establishment of firm identifica-

tion and ties to their present families. They have almost blotted out in their minds their relationship with their biological parents. Even with Stephen, 12, the time factor is important in view of the fact that he has only spent ten months with his biological parents since infancy. Returning them to their biological parents would represent a "summary and drastic change" in their life circumstances likely to cause them "serious psychological injury." *Sorentino v. Family and Children"s Society of Elizabeth*, 72 *N. J.* 127 (Sup. Ct. 1976).

In such cases, Goldstein *et al., op. cit.,* recommended that the "best interests" standard be replaced by that of the "least detrimental available alternative."

The least detrimental available alternative is that * * * procedure for child placement which maximizes, in accord with the child's sense of time, the child's opportunity for being wanted and for maintaining on a continuous, unconditional, and permanent basis a relationship with at least one adult who is or will become the child's psychological parent(s).

In 1971 our Appellate Division recognized the need to protect small children from traumatic separation from their "psychological parents":

Both [child psychologists] testified as to the traumatic shock a very young child can experience when separated from the only mother it has ever known, and handed over to another woman, albeit the natural mother, with whom it has no real identification. [*In re P. and wife*, 114 *N. J. Super.* 584, 593 (App. Div. 1971)]

In reversing the decision of the trial court, Judge Goldmann stated:

The emphasis in the trial judge's resolution of an admittedly difficult problem was upon biological parenthood rather than what has been termed psychological parenthood, *i. e.*, the mutual interaction between adult and child described in such terms as love, attention, basic trust and confidence, considered essential for the child's successful development. * * * See Note, "Alternatives to 'Parental Right' in Child Custody Disputes Involving Third Parties," 73 *Yale L. J.*

96

152 (1963). * * *The trauma of separating a child from the custody of an adult with whom an affection-relationship exists "may be psychologically equivalent in its detriment to the orphaning of that child. * * *" [at 594–595]

Other jurisdictions have incorporated the concept of psychological parenthood into decisions terminating parental rights. *In re Massey,* 35 Ill. App. 3d 518, 341 *N. E.* 2d 405 (App. Ct. 1976) ; see also, *Ross v. Hoffman,* 33 Md. App. 333, 364 *A.* 2d 596 (Md. Ct. Spec. App. 1976) (approving the trial judge's reliance on *Beyond the Best Interests of the Child, supra*) ; *Boyer v. Boyer,* 46 *Ohio St.* 2d 83, 346 *N. E.* 2d 286 (Sup. Ct. 1976) ; *In re Hrusosky,* 39 Ill. App. 3d 954, 351 N. E. 2d 386 (Ct. App. 1976) ; *Bennett v. Jeffreys,* 40 *N. Y.* 2d 543, 387 N. Y. S. 2d 821, 356 N. E. 2d 277 (1976).

A recent New York Federal District court decision supports the importance of considering both psychological parenthood and the child's sense of time in custody decisions. It requires that before a child who has been in foster care for one year or longer can be subjected to a change in custody, he must be given a judicial hearing to review the proposed transfer. *Organization of Foster Families for Equality and Reform v. Dumpson,* 418 *F. Supp.* 277 (S. D. N. Y. 1976).

■■ In the present case, this court is compelled to determine that Mr. and Mrs. Huggins are unfit to parent the five children for whom termination of parental rights has been sought in this guardianship action. The parental rights of Stephen and Joan Huggins will be terminated and severed permanently as to their children, William David, Raymond, Joel, Stephen, Jr. and Anne Marie. These children shall become the legal wards of the Division for all purposes, "including * * * placement * * * for adoption." *N. J. S. A.* 30 :4C–20.

The Division has not sought guardianship of the three children who remain with their biological parents, namely, Charles, Joan and Bertha. These children have been com-

mitted to the care and close supervision of the Division pursuant to *N. J. S. A.* 9:6–8.51 et seq.. All three children appear to have formed psychological bonds with their biological parents. See Wald; "State Intervention on behalf of 'Neglected' Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights," 28 *Stanford L. Rev.* 623 (1976).

██ Close supervision by the Division, backed by the power of this court, has apparently prodded the Huggins into providing adequate physical care for them. Moreover, all three children are old enough to feed, wash and dress themselves. The Huggins themselves have asked the court to provide psychiatric help for Charles. In determining at this time to leave these three children with their biological parents, the court is applying a standard new to custody decisions in New Jersey — that of the "least detrimental available alternative." No better plan has been submitted to this court, nor has this court been able to develop a better alternative.

Therefore, Charles, Bertha and Joan shall be placed under the protective custody of the Division for a period of 18 months. They may remain in the Huggins' home, provided that there is close supervision and frequent inspection by the Division. In the event that there is any indication of the resumption of neglect and abuse, immediate application should be made to this court for their removal or other appropriate relief.

This court will retain jurisdiction over all the Huggins children. It is of the utmost importance that the Division provide a stable emotional setting for each child over whom it has obtained permanent guardianship. The Division is hereby ordered to appear and present to this court a permanent plan for William David, Raymond, Joel, Stephan and Anne Marie, within six months from the date of this judgment. It would appear to be in the best interests of William David, Raymond and Joel that they be adopted by their

foster parents. While the immediate adoption of Stephen[1] and Anne Marie may not be possible, these two children are entitled to assurances by the Division that a long term placement will be provided to insure their development of stable relationships with nurturing parents.

---

[1]Recently enacted California legislation encourages permament foster care relationships by requiring courts to consider "stable long-term foster care placement" where the "minor's foster parents are unable to adopt the minor because of exceptional circumstances, but are willing and capable of providing the minor with a stable and permanent environment and the removal of the minor from the physical custody of the foster parents would be seriously detrimental to the emotional well-being of the minor because the minor has substantial psychological ties to them." Calif. W. & I. Code, § 729.5 (d), (e)(1)(C) (1976).