In re DAVID.

No. 79–271.

Supreme Court of Rhode Island.

March 17, 1981.

John Farley, Dept. of Children & Their Families, Providence, for petitioner.

John B. Reilly, Providence, for respondent.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal from a decree of the Family Court terminating the parental rights of the father of David [1] pursuant to the provisions of G.L.1956 (1969 Reenactment) § 15–7–7, as amended by P.L. 1970, ch. 132, § 1, on the ground of neglect of the parent "for a period of more than one (1) year, substantially and repeatedly, to maintain contact with and plan for the future of the child." [2] The facts of the case covering a period of several years are set forth below.

1. When this case was docketed in this court, the record disclosed that the appeal had been taken from a decision of the Family Court, but no decree had been entered. However, on March 3, 1981 a written order or decree was entered *nunc pro tunc.* We shall treat the appeal as though taken from this decree.

2. General Laws 1956 (1969 Reenactment) § 15–7–7, as amended by P.L.1970, ch. 132, § 1, as it was during all times relevant to this controversy, stated in pertinent part as follows:

"If either parent be under guardianship, or imprisoned at any adult correctional institution under a sentence for a term of not less than three (3) years, or has willfully deserted for one (1) year next preceding the time of the filing of the petition, or has neglected to provide proper care and maintenance for the child for one (1) year next preceding the time of the filing of the petition where financially able to do so, or if the child is permanently neglected as defined herein, or if the parent is mentally incompetent, resulting in the incapacity to provide care for a prolonged or indeterminate period, the court shall proceed as if such parent were dead, and, after notice to the natural parent or parents as provided in § 15–7–8, the court in its discretion, may appoint some suitable person to sit in the proceedings as next friend of the child and to give or withhold the consent as aforesaid, provided in such cases as set forth above any duly licensed child placement agency or governmental child placing agency in this state having the care of such a child under eighteen (18) years of age may petition the family court for the termination of the rights of the natural parents of such child to consent to the adoption. Thereupon, after notice to the natural parent or parents, as provided in § 15–7–8, a hearing shall be held in the family court before the hearing on the petition for adoption. If the court finds that the parent or parents are under guardianship, or imprisoned in an adult correctional institution under a sentence for a term of not less than three (3) years, or has wilfully deserted for one (1) year next preceding the time of the filing of the petition, or has neglected to provide proper care and maintenance for the child for one (1) year next preceding the time of the filing of the petition, where financially able to do so, or if the child is a permanently neglected child as defined herein * * * it shall decree that the agency shall have the exclusive right to place such child for adoption and to be the sole party to give or withhold consent.

"If the court finds that the agency shall be the sole party to give or withhold consent to the adoption of such child, the consent of the natural parents as provided above shall be unnecessary and the rights of the natural parent or parents to give or withhold consent shall be thereupon terminated.

"The granting of the petition to give or withhold consent to the aforesaid agency shall also make said agency the guardian of such child for all purposes.

"A 'permanently neglected child' is a person under eighteen (18) years of age who has been placed in the care of an authorized agency, either in an institution, foster home, or the home of a relative and whose parent or custodian has failed for a period of more than one (1) year, or such lesser period as may be set by the court upon ex parte petition of the agency, following the placement or commitment of such child in the care of an authorized agency, substantially and repeatedly to maintain contact with and plan for the future of the child, notwithstanding efforts which

On January 24, 1974, a social caseworker employed by the Child Welfare Services Division of the Department of Social and Rehabilitative Services was notified by a representative of the Pawtucket Memorial Hospital that David had been brought to the hospital suffering from malnutrition and failure to thrive. The hospital report disclosed developmental delay in the twenty-month-old child so that a portion of his bone structure was equivalent to that of a nine-month-old infant. Further investigation indicated that the child had been in the custody of his mother and the mother's niece. The mother reported that she had been separated from her husband and did not know where he was although she desired to transfer custody to her husband. The mother reported that there was considerable violence in her household but that the baby had not been injured thereby. The mother further disclosed to investigators that she had had two previous children, both of whom had failed to thrive and ultimately had died.

Thereafter, a petition was filed by a representative of Child Welfare Services seeking temporary custody of David upon his release from the hospital. The petition was granted, and David was placed in a foster home on February 4, 1974. Subsequently, the father telephoned the agency on February 12, 1974, indicating that he had been away from the area for approximately one year but intended to be in the vicinity in the future.

On March 28, 1974, a hearing was held in the Family Court to consider the question of custody of David. Apparently, with the father's consent, an order was entered granting custody of the child to the Child Welfare Services of the Department of Social and Rehabilitative Services until further order of the court. The father was granted visiting privileges, but the record indicates that he missed scheduled visits and was less than cooperative in visiting in a supervised setting. Between February and July 1974, eight visits took place. On July 21, 1974, during a supervised visit at the Children's Center, the father took his son, without permission, and removed him to a location in Maine. On July 31, 1974, the police located David in Maine, and returned him to Rhode Island where he was again entrusted to the custody of Child Welfare Services on August 9, 1974.

During the following year the father visited with his son intermittently, and on February 20, 1975, a hearing was held in order to review the question of custody and to consider the father's petition to return David to his custody. The father did not appear at this hearing, and the case was continued for review until November 6, 1975. Custody was retained by Child Welfare Services.

On August 15, 1975, the father's girlfriend contacted a representative of Child Welfare Services to arrange for a visit for the father. The visit did not take place because no specific date was arranged. Apparently, no visit took place between January 1975 and April 14, 1976, upon which date a supervised visit was held at the Children's Center. On May 6, 1976, a hearing was held in Family Court concerning custody of David. The father was not present and the case was continued to June 3, 1976, to give the public defender a further opportunity to contact the father. A hearing was held on June 3, 1976. The father did not appear and the case was continued nisi.

During the year 1977, letters were mailed by representatives of Child Welfare Services to the father at his last known address and to agencies in Rhode Island and Maine which might have information concerning his whereabouts. None of these attempts succeeded in establishing contact with the father. Finally a social case worker assigned to David's case wrote to the father in care of a person believed to be the fa-

shall be made by the said agency to encourage and strengthen the parental relationship."

Subsequent to the hearing in this case, the foregoing section was substantially amended by P.L.1980, ch. 364, § 2. Said amendments do not affect the case at bar.

ther's girlfriend. A telephone call was received from the girlfriend on January 6, 1978, and on January 10, 1978, the father called the social case worker in response to the letter. An appointment was made between the father and the social worker for January 19, 1978. During the course of this meeting the social worker outlined to the father the various attempts to locate him since April of 1976. The social worker testified that the father's response was as follows:

"He said that it was our responsibility to find him and that if I wanted to find him, I could have found him any time."

The social worker then explained to the father that since he had failed to maintain contact with the agency and had not seen his son for a period of almost two years from April 1976, the agency planned to petition for termination of his parental right to consent to adoption.

A hearing pursuant to the petition to terminate parental rights began November 13, 1978, and concluded on January 23, 1979, with the following findings and conclusions by the trial justice:

"[T]he Court finds as a fact, by clear and convincing evidence, that the agency through the efforts of its workers, did, in fact, fulfill the statutory burden imposed upon it, by affording to the Respondent visitation with the child with a view to ultimately reuniting parent and child. The Court further finds, as a fact, that the Respondent was ambivalent with regard to the visitation and, in fact, left the State of Rhode Island and Child Welfare Services after numerous efforts to locate him was [sic] unable to do so for a long period of time. The Court further finds, as a fact, that [respondent's] reasons for not seeing the child were completely refuted by his counsel from 1974 to present, and that he has failed substantially and repeatedly to maintain contact with and plan for the future of the child.

"There is not one scintilla of evidence, nor any witnesses produced by the Respondent, which would indicate that he either intended some future plan for David nor that he had any ability to do so. It is also quite clear that the attorney representing [the father] on a serious charge in Superior Court, all during the times in question had no idea of his address or how to get in touch with him, nor would he divulge [the] same to his attorney.

"It is time for the Court and the State to look after the best interests of the minor child in this matter. David has been in foster care since 1974, and, any further delay would further serve to diminish his chances of being adopted."

The court went on to conclude that:

"the child is permanently neglected within the provisions of Title 15, Chapter 7, Section 7 of the 1956 General Laws of Rhode Island, and, that the Department of Social and Rehabilitative Services, Child Welfare Services, shall have the exclusive right to place the child for adoption, and shall be the sole party to give or withhold consent, and the consent of the natural parent is unnecessary and the rights of the natural parent are herewith terminated."

The parental rights of the mother were terminated, without objection, by decree entered February 26, 1979. The instant appeal challenges only the termination of the father's parental rights. In support of his appeal, the father raises a number of issues which will be dealt with in the order in which they are presented in his brief.

I

IS A PETITION FOR ADOPTION A JURISDICTIONAL PREREQUISITE TO THE CONSIDERATION OF AN AGENCY PETITION TO TERMINATE PARENTAL RIGHTS?

■ The provisions of G.L.1956 (1969 Reenactment) § 15–7–7 in effect at the time of determination of this controversy, disclose inter alia that when parents' rights to consent are terminated, the court "shall decree that the agency shall have the exclusive right to place such child for adoption and to be the sole party to give or withhold

consent." This statutory language clearly indicates that the Legislature contemplated that the agency might place the child for adoption after the determination of a petition to terminate parental rights. A reading of the statute as a whole does not lend itself by strict construction or otherwise to the interpretation that a petition for adoption must be filed prior to consideration of the petition to terminate parental rights. Indeed, the entire statutory scheme would most reasonably be served by giving the agency the opportunity to terminate parental rights in advance of encouraging potential adoptive parents to anticipate the probability of a future adoption. In the diverse settings in which an adoption may take place, the selection of prospective adoptive parents may often depend upon the ability of the agency to give assurance that the child may be placed for adoption without the necessity of future court proceedings to terminate the right of the natural parents to consent to such an adoption. The father's arguments to the contrary would require a strained and tortured interpretation of language and are unpersuasive in the furtherance of the statutory purpose.

■ The father argues in support of the necessity of a petition for adoption that the absence of such a petition, prior to termination of parental rights, constituted a denial of due process. We believe that this contention is utterly without merit and that due process would not be affected by the presence or absence of a pending petition for adoption.

## II

## EVIDENTIARY LIMITATIONS

■ The father contends that the trial justice erred in limiting the introduction of evidence regarding neglect to the period preceding the filing of the petition to termi-

nate parental rights. The language of § 15–7–7 requires as a condition precedent to termination of parental rights a finding by the court that the parent "has neglected to provide proper care and maintenance for the child for one (1) year next preceding the time of the filing of the petition * * * [or that the parent has neglected] to maintain contact with and plan for the future of the child [for such period]." We have construed this language as requiring "that the year in question must relate to the year immediately preceding the filing of the petition * *." *In re Gregory,* 118 R.I. 178, 183, 372 A.2d 1277, 1280 (1977) (petition for adoption). In this case, the plain and unambiguous language of the statute would require the same result. Therefore, the trial justice was correct in limiting the period of relevance to times and dates preceding the filing of the petition.[3]

## III

## BURDEN OF PROOF

■ The trial justice in this case determined in his findings of fact that the petitioning agency had established neglect by clear and convincing evidence. The father argues that this quantum of proof was inadequate and that the standard should be that of proof beyond a reasonable doubt. In *Gillis v. Main,* 96 R.I. 88, 189 A.2d 808 (1963), we applied a standard of "clear and convincing evidence" in determining whether the record supported findings of desertion and neglect pursuant to the provisions of the same statute as that in issue in the case at bar. *See also In re Adoption of Minor Child,* 109 R.I. 443, 451, 287 A.2d 115, 119 (1972). It is conceded by the father that a majority of jurisdictions which have considered the question also apply the standard of clear and convincing evidence as opposed to proof beyond a reasonable doubt.[4] However, he argues that this rule

3. It is not claimed by the father that he made any payments for the support of the child either prior to or subsequent to the filing of the petition for termination of parental rights.

4. See, e. g., *Alsager v. District Court,* 406 F.Supp. 10 (S.D.Iowa 1975), *aff'd,* 545 F.2d

1137 (8th Cir. 1976); *Carlson v. State Department of Health and Rehabilitative Services,* 378 So.2d 868 (Fla.1979); *In re Massey,* 35 Ill. App.3d 518, 341 N.E.2d 405 (1976); *In re Atwood,* 2 Kan.App.2d 680, 587 P.2d 1 (1978).

does not give sufficient protection to the rights of the parents. We pointed out in *In re Lester*, R.I., 417 A.2d 877, 880 (1980), that questions concerning the custody of children are three-dimensional. They involve not only a controversy between a state agency and the parent but also a controversy in which the rights of children are of significant importance. The standard of proof beyond a reasonable doubt is one adopted in order to prevent the application of criminal sanctions from being visited upon individual defendants. As we suggested in *Lester*, we must be careful, in erecting an edifice of impenetrable procedural safeguards in favor of parents, that we do not neglect to protect the interests of children who are often the helpless victims of parental neglect or abuse. Given the tripartite nature of this controversy, we believe that the standard of clear and convincing proof gives adequate protection to the rights of the parents without unduly inhibiting the trier of fact from the ability to grant relief to the child.[5]

## IV

### IS THE STATUTE UNCONSTITUTIONALLY VAGUE?

■ The father argues that the standards set by § 15–7–7 are unconstitutionally vague. The statute describes the required finding of the court to be that the parent

"has neglected to provide proper care and maintenance for the child for one (1) year next preceding the time of the filing of the petition, where financially able to do so, or if the child is a permanently neglected child as defined herein * * *."

Obviously, the Legislature has not defined the term "proper care and maintenance" in all of its potential ramifications. It has defined a permanently neglected child as follows:

"A 'permanently neglected child' is a person under eighteen (18) years of age who has been placed in the care of an authorized agency, either in an institution, foster home, or the home of a relative and whose parent or custodian has failed for a period of more than one (1) year, or such lesser period as may be set by the court upon ex parte petition of the agency, following the placement or commitment of such child in the care of an authorized agency, substantially and repeatedly to maintain contact with and plan for the future of the child, notwithstanding efforts which shall be made by the said agency to encourage and strengthen the parental relationship." G.L.1956 (1969 Reenactment) § 15–7–7, as amended by P.L.1970, ch. 132, § 1.

We believe that given the limitations of the English language with respect to being both specific and manageably brief, these terms are such that the ordinary person exercising reasonable common sense can sufficiently understand and comply with them without sacrifice to the public interest. *See United States v. Harriss*, 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989, 996–97 (1954). The father also raises possible interpretations of the statute in regard to periods of less than one year which might result in forfeiture of parental rights where fault was less than clear. Generally in cases not involving freedom of expression, the Supreme Court of the United States in response to challenges of vagueness has used an "as applied" test. This test involves an analysis under which it has been determined that one who has received fair warning in respect to his own conduct from the statute in question is not entitled to attack it on the basis that the language would not give similar fair warning with respect to other conduct that might be within its broad and literal ambit. One to whose conduct a statute clearly applies may not successfully challenge it for vagueness. *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439, 458 (1974). In *Broadrick v. Oklahoma*, 413 U.S. 601, 93

---

5. This determination has legislative support in G.L.1956 (1969 Reenactment) § 15–7–7(d), as amended by P.L.1980, ch. 364, § 2. In the revised section the Legislature has specifically provided that "[t]he standard of proof shall be by clear and convincing evidence." The prior form of the statute did not specify the standard of proof.

S.Ct. 2908, 37 L.Ed.2d 830 (1973), the court observed:

> "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Id.* at 610, 93 S.Ct. at 2915, 37 L.Ed.2d at 839.

■ We applied this principle in *Aiudi v. Baillargeon*, R.I., 399 A.2d 1240 (1979), to the phrase "conduct unbecoming an officer," which had been attacked as unconstitutionally vague. There, as here, the person whose conduct was alleged to have violated the statutory standard had reasonable notice of such violation in the context in which the issue arose. Here, the evidence disclosed that the father had made utterly no effort to be in touch with his child or the agency in whose custody the child had been placed for a period of approximately two years. The evidence was uncontradicted that he had not contributed a penny to the child's support during the period of time that the child was in the custody of Child Welfare Services. Other than occasional aggressive bluster, the father had shown virtually no interest in David from the time that the child had been admitted to the hospital in a state of critical malnutrition. No reasonable person could argue that he would be unaware that this conduct constituted failure to "maintain contact with and plan for the future of the child" for the necessary period.

■ In support of his argument, the father cites *Alsager v. District Court*, 406 F.Supp. 10 (S.D.Iowa 1975), *aff'd*, 545 F.2d 1137 (8th Cir. 1976). In that case a Federal District Court applied strict judicial scrutiny to an Iowa statute relating to termination of parental rights. Pursuant to strict judicial scrutiny, the Iowa statute was found to be unconstitutionally vague. It should be noted that the Court of Appeals for the Eighth Circuit, in affirming the judgment, avoided the vagueness doctrine and placed its reliance upon the lack of procedural and substantive due process in the actual termination proceeding. In any event, the language of the Iowa statute which set forth an alternate ground of termination in the event that the parents were "unfit" by reason of conduct "detrimental to the physical and mental health or morals of the child" differs markedly from the language of the Rhode Island statute. Moreover, we rejected the application of the doctrine of strict judicial scrutiny in an analogous child custody case, *In re Lester*, R.I., 417 A.2d 877 (1980), and we consider the doctrine inappropriate for application to the statute in the case at bar. Again we reiterate that in cases involving termination of the parental right to consent or to withhold consent to adoption, we are dealing with a balancing of the interests of three parties. This is not a matter merely of interference with a private right by a state agency. The process involves the determination of the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive. As we said in *Lester*, in child abuse and related custody proceedings, we have long espoused the position that the rights of parents are a most essential consideration, but we further recognize that the best interests and welfare of the child outweigh all other considerations. *Id.* 417 A.2d at 880; *In re Denise*, R.I., 408 A.2d 606, 607 (1979); *Engelhardt v. Bergeron*, 113 R.I. 50, 57, 317 A.2d 877, 882 (1974). The foregoing principles are not inconsistent with a respect for parental rights with which no agency of the state may interfere on arbitrary or irrational grounds. *In re Jonathan*, R.I., 415 A.2d 1036, 1039 (1980).

■ Consequently, we believe that the trial justice was correct in holding that the pertinent provisions of § 15–7–7 are not unconstitutionally vague.

## V

### WERE THE FINDINGS OF PERMANENT NEGLECT CLEARLY ERRONEOUS?

■ An examination of the evidence and record of this case discloses a child who was

near death from improper care and maintenance at the hands of his mother. At this time the whereabouts of the father were unknown. Over the ensuing period of approximately two years, the father made no effort to cooperate with Child Welfare Services in order to create an appropriate relationship with his son. His attitude was one of aggressive independence.

He took the position that the lack of past care and maintenance should not in any way interfere with his right to take his child and do with him as he would. The failure to provide nourishment and support should all, in the opinion of the father, be forgotten and he should be given his child as though nothing untoward had occurred.

When the agency in appropriate and understanding concern for the welfare of the child insisted on a period of observation and supervised visits, the father simply seized what he regarded as his property and took the child into another state. It is true that criminal charges arose out of this incident, which may have deterred the father in his desire for visitation. However, the agency attempted by all reasonable means to contact this individual over a period of many months. The record discloses that he was simply unwilling to create a relationship with the child on any but his own terms.

The report of the guardian ad litem in this case had some favorable overtones. The father has apparently been sharing his home with a woman to whom he is not married but who has borne him a child. This home was found by the guardian ad litem to be adequate.

However, in light of the absence of any consistent manifestation of interest and concern by the father in this case, the fact that for approximately two years representatives of Child Welfare Services could not contact him at all, the fact that he made no attempt to contact them, and even more significant, that he recognized no obligation to come forward, it would seem that the finding by the trial justice of permanent neglect was amply justified.[6]

Intermittent interest, even when accompanied by apparent indignation, does not and cannot overcome years of neglect. It was the obligation of the trial justice to consider the interests of David. This he did. No better summary of an appropriate conclusion could be given than that stated by the court:

"It is time for the Court and the State to look after the best interests of the minor child in this matter."

The finding of neglect in the context of the facts of this case was buttressed by the necessary quantum of proof.

For the reasons stated, the appeal is hereby denied and dismissed, the decree of the Family Court is affirmed, and the papers in the case may be remitted to the Family Court.

SHEA, J., did not participate.

6. During the course of the proceedings in the Family Court, general reference was made to the criminal record of the father. He testified that he had been arrested on numerous occasions but that he was never convicted of any crime as an adult. On cross-examination, the father admitted that he had been convicted of criminal offenses twice in New York, in 1957 and 1967. It is apparent from a reading of the trial justice's decision that he did not consider the father's criminal activity in deciding this case. After the decision of this case in the Family Court, and while this case was pending on appeal, the father was convicted in Superior Court of a serious criminal offense and sentenced to serve thirteen years in the Adult Correctional Institution. In the event that this conviction should be sustained on appeal, it would furnish a separate and adequate ground for termination of parental rights under the terms of § 15–7–7. Since this court was not informed by either of the parties of this conviction and since it formed no part of the basis for the determination of the Family Court, we have not considered it in respect to disposition of the appeal.