**In re OSCAR C.**

**No. 90–20 Appeal.**

Supreme Court of Rhode Island.

Nov. 1, 1991.

Edward H. Newman, Adamo & Newman, Westerly, for plaintiff.

Lauren E. Jones, Robert S. Thurston, Jones Associates, Providence, Philip M. Sloan, Jr., Orsinger & Nardone, Westerly, for defendant.

## OPINION

MURRAY, Justice.

This is an appeal by Oscar B. Chapman III, the natural father of Oscar C., from a Family Court decree permitting the natural mother's husband to adopt Oscar C. without the natural father's consent, as permitted under G.L. 1956 (1988 Reenactment) § 15–7–7. The natural father's parental rights were terminated on grounds that "[t]he parent has willfully neglected to provide proper care and maintenance for the child for a period of at least one year where financially able to do so." Section 15–7–7(1)(a).[1] We reverse.

The following facts are established by the record. Oscar B. Chapman III (Oscar III) and Robin Chapman Martini (Robin) were married in 1973 and divorced in 1980 on grounds of irreconcilable differences. The couple had one child, Oscar C., who was born in October 1975. Robin was awarded custody of the child, and Oscar III was granted reasonable rights of visitation pursuant to the final judgment entered July 29, 1980. Pursuant to this judgment Oscar III was ordered to pay to Robin the sum of $50 per week in child support; to maintain life and health insurance for the benefit of the child; and further ordered to pay all reasonable dental and medical bills incurred on behalf of the child. Robin re-

---

1. General Laws 1956 (1988 Reenactment) § 15–7–7 provides, in part:

   "(1) The court shall, upon a petition * * * terminate any and all legal rights of the parent to the child, * * * if the court finds as a fact that:

   (a) The parent has willfully neglected to provide proper care and maintenance for the child for a period of at least one year where financially able to do so."

married in 1981 and resides in Cranston. Oscar III remarried in 1987 and resides in Westerly.

Dissension arose between Robin and Oscar III as to the visitation schedule, which culminated in a series of motions filed by the parties relating to child support and the visitation schedule. In September 1984 an order was entered that required Oscar III to pay an arrearage in the sum of $350. It also modified the visitation schedule to provide for visitation with the child every other weekend plus various holidays.

In July of 1985, Oscar III filed a second motion to modify visitation requesting to have Oscar C. in his care and custody for four uninterrupted weeks during the summer of 1985. This motion was allowed. A third order dated August 28, 1985, was entered, calling for visitation on alternate weekends, alternate holidays, three days of each school vacation, Christmas and New Years and at least one uninterrupted month during the summer. Oscar III filed another motion in December 1985, claiming that Robin refused to allow him visitation with Oscar C. as called for by the previous order. Another order was entered in January 1986 which maintained the visitation schedule delineated in the order dated August 28, 1985, except that in the event Oscar C. did not wish to visit with his father he would not be obligated to do so.

In February 1989 Oscar III moved for a change of custody seeking to adjudge the mother in willful contempt for denying him visitation and requested that the court appoint a guardian ad litem to represent the interests of the child. In his affidavit attached to the motion, Oscar III asserted that he had been denied all forms of visitation, including telephone access, to his son since February 1988. He also claimed that the mother had attempted to alienate the child from him.

On March 7, 1989, Robin and her husband, Joseph Martini, filed a petition to permit Mr. Martini to adopt Oscar C. In their petition, they alleged that "the natu-ral father has failed to provide support for a period of one (1) year having sufficient ability to do so."

Hearings on the petition for adoption took place on May 23, 1989, and August 15, 1989.[2] At the hearings Oscar III admitted that in 1988 he failed to make child-support payments to Robin. He testified, however, that he deposited money into an account on behalf of his son and presented evidence in the form of a bank book that contained more than $7,000. He also testified that he had taken out an annuity in Oscar C.'s name in the amount of $100,000. Oscar III testified that he set this money aside rather than pay it in child-support payments to his former wife because he had been denied visitation. Although the original order directed Oscar III to pay Robin $50 per week, the parties' conduct established an alternate method of payment. Oscar III testified that there was an "agreement" in place that he would send checks to Robin through Oscar C. at the end of each visitation. Consequently, as the frequency of visitation declined and eventually ceased, so did the payment of support. Oscar III introduced into evidence an exhibit illustrating this course of conduct. The exhibit lists visits from May 1986 through December 1987 and the coinciding child-support payment tendered to Robin via Oscar C.

Oscar III testified that the last visit by the child to his home was in December 1987. Oscar III did, however, see his son in March 1988, but this meeting did not result from a scheduled visitation. Oscar C. was visiting another relative at the time of the christening of Oscar III's newborn baby, and Oscar C. attended the post-christening reception held at his father's house. Oscar III asserts that this visit was not visitation as contemplated by the divorce decree, and claims that he was, in fact, denied visitation in 1988. Oscar III also testified to his frequent attempts to contact his son, most of which proved unsuccessful. He introduced a list of approximately 199 telephone calls he had made between

2. Hearings on Oscar III's various motions were never heard by the trial justice because he first decided the petition for adoption.

1985 and September 1988—42 of which were returned by his son collect. Testimony revealed that Oscar III had sent cards to his son which were returned to him unopened marked "Return to Sender."

On January 25, 1989, Oscar III tendered to Robin a check in the amount of $500. From February 1989 through May 1989 Oscar III tendered to Robin eleven $75 checks. Oscar III testified that the $500 check was for arrearages; that $25 of each $75 check tendered thereafter was also for arrearages; and that the balance of each was for current support payments. Oscar III testified that, according to his calculations, the total amount due as of the date of the May 23, 1989 hearing was $2,225. Oscar III introduced into evidence at that hearing a check prepared in the amount of $2,225.

Robin testified that she never discouraged her son from visiting his father; nor that she prevented him from receiving or making telephone calls to or from his father. She testified, however, that Oscar C. did not like to visit with his father.

At the close of the May hearing and before he rendered his decision the trial justice ordered that Oscar C. be interviewed by Dr. James E. Greer, a child-psychiatrist consultant. In his report, the doctor noted that Oscar C. stated that he first decided to pursue the idea of adoption by his stepfather because of an unsatisfactory relationship with his natural father. Oscar C. described his relationship with his stepfather as loving and supportive, and claimed that neither his stepfather nor mother asserted influence upon him regarding the adoption.

Doctor Greer also interviewed Robin while Oscar C. was present, and interviewed Oscar III on a separate occasion. The doctor received conflicting information as to the circumstances which led to Oscar C.'s request for adoption: Robin asserting that she fostered a neutral environment and that the adoption petition was at Oscar C.'s request; and Oscar III claiming that Robin's behavior caused Oscar C. to become alienated from him. Doctor Greer concluded, however, that "on psychiatric evaluation the child [did] not demonstrate any concrete evidence or other indications of coercion by any party." The doctor found that "[t]here is no evidence of psychopathology, or of any psychological factors operating in Oscar which [made] his requests inappropriate." He noted that although Oscar C. does not appear to have a good understanding of the effect of his decision upon his natural father, he does not give any indication of anger or revenge.

The trial justice issued a bench decision on August 15, 1989, and in it made several findings of fact. First, he noted that it was the child's desire to have the adoption take place. He also found Mr. Martini a suitable adoptive father. He also noted that from December 20, 1987, to January 25, 1989, no child-support payments were made by Oscar III to Robin, and that during this period, the father did not have any disabilities that would have interfered with the payment of support. The court found that from January 25, 1989, to the time of the first hearing, $75 a week was paid for support. The court noted that during a period of one year no support was paid, and although the father complained of denial of visitation, he filed no motions with the court to cite the mother in contempt for refusing to allow visitation. The trial justice found, however, that there was visitation in March 1988, referring to Oscar C.'s attendance at the postchristening reception.

The court concluded by holding that the allegation that the natural father has failed to provide support for a period of one year having sufficient ability to do so is substantially shown by clear and convincing evidence. The court further held the payment of $500 and subsequent payments of $75 to be infrequent and insubstantial.

The court held, upon perusal of the Family Court investigation report and Doctor Greer's report, and upon consideration of all the testimony and evidence, that it was in the best interest of the child that the petition for adoption be granted, thereby terminating Oscar III's parental rights. In

light of this decision, Oscar III filed notice of appeal on September 1, 1989.

Oscar III assigns as his reasons of error that the totality of the evidence fails to support the trial justice's findings that the father willfully neglected to provide care and maintenance for his child for a period of one year; that the term "proper care and maintenance" encompasses more than merely court-ordered child-support payments; and that the trial justice erred in considering the desires and interests of the child prior to determining that the natural father had willfully neglected the child.

General Laws 1956 (1988 Reenactment) § 15–7–5(a) requires the parents of a child to consent in writing to the adoption of the child or the petition will be dismissed. Section 15–7–5(b)(1) provides, however, that "[n]otwithstanding the provisions of subsection (a) * * * if the noncustodial parent refused to consent to the adoption, the court shall determine whether the noncustodial parent's rights shall be terminated involuntarily." In making this determination, the court shall look to § 15–7–7, which enunciates the grounds for involuntary termination of parental rights. Section 15–7–7(1)(a) allows for such termination if the parent has "willfully neglected to provide proper care and maintenance for the child for a period of at least one year where financially able to do so." That section also states that in determining whether the parent has so neglected the child, the court may disregard payments which are of an "infrequent and insubstantial nature." The court shall apply a standard of "clear and convincing evidence" in determining whether the record supports findings of neglect sufficient to terminate parental rights. Section 15–7–5(b)(2).

■ The term "proper care and maintenance" has not been defined by either the Legislature or this court. *See In re David*, 427 A.2d 795, 800 (R.I.1981). This court, however, quoted with approval the Ohio Supreme Court's construction of statutory language similar to that contained in § 15–7–7(1)(a), suggesting its propriety. *Gillis v. Main*, 96 R.I. 88, 96, 189 A.2d 808, 812 (1963). In *In re Adoption of Biddle*, 168 Ohio St. 209, 217, 152 N.E.2d 105, 111 (1958) the Ohio Supreme Court stated, "[t]he phrase, 'properly support and maintain', certainly implies more than mere financial support," and it further implied that the phrase "includes kindness, personal care and attention, as well as the furnishing of food and shelter." *Id.* (quoting *Mruk v. Mruk*, 379 Ill. 394, 400, 41 N.E.2d 490, 494 (1942)). In *Gillis* we said that "[w]e are not prepared to assume that in a proper case this court would not be constrained to give the phrase as it appears in our statute a similar interpretation." *Gillis*, 96 R.I. at 96, 189 A.2d at 812. The case at bar is precisely the type of case anticipated by this court in its *Gillis* decision. The nonpayment of child support was only one of many pieces of evidence that could have been considered in determining neglect. There was an abundance of testimony relating to "kindness" and "attention," and, in fact, other evidence of financial support. In this instance, justice requires a broader interpretation of the term "proper care and maintenance" than the narrowly focused one afforded it by the trial justice. Accordingly an examination of the record is necessary.

■ It is well established that the findings of a trial justice will be given great weight and will not be disturbed on appeal unless shown to be clearly erroneous. *In re Joseph*, 420 A.2d 85, 89 (R.I.1980); *In re LaFreniere*, 420 A.2d 82, 84 (R.I.1980). "Nevertheless, on appeal from a final decree in equity the whole case is opened up and the correctness of the decision is subject to review by this court on the basis of the entire record." *Gillis*, 96 R.I. at 94, 189 A.2d at 811.

■ A scrutiny of the record persuasively reveals that Oscar III provided care and maintenance for his son from the time of his divorce until December 1987 and, although in a somewhat modified form, during 1988 and into 1989. It is undisputed that, except for the payment of weekly child support, Oscar III met all obligations in the divorce decree relating to the care and maintenance of his son, that is, health and life insurance. It is also undisputed

that for the seven years after the natural parents' divorce, Oscar III generally met his support obligation. There is no dispute that it was only a thirteen-month period in which Oscar III failed to meet one of three obligations set forth in the divorce decree. In this relatively short period, it is also undisputed that Oscar III was effectively denied visitation, and that he made many attempts to contact his son via phone and mail. Upon consideration of this evidence, this court is troubled by the fact that the son may have been used as a "pawn" in this domestic battlefield; the tool by which support payments were effectuated was strategically made unavailable. In the interests of justice, we cannot allow such conduct to result in the drastic outcome petitioned for by the natural mother and her present husband.

Moreover, the record is replete with evidence demonstrating Oscar III's good-faith efforts to pay arrearages as he resumed payment of weekly child support in early 1989. The evidence indicates that these payments were made prior to any notice of the petition for adoption. Furthermore, the filing of motions by the father for visitation, for change in custody, and for the appointment of a guardian ad litem prior to the filing of the adoption petition illustrate Oscar III's concern for the status of his relationship with his son. This is not a case of desertion like the one we reviewed in *In re Adoption of L. and G.*, 118 R.I. 316, 373 A.2d 799 (1977). There the natural father's whereabouts were unknown, and he made no efforts to contact his children. Upon learning of the adoption hearing via publication, the natural father appeared at the hearing to protest. It was not until that time, after receiving legal notice, that he tendered any payment. In the case at bar, the evidence depicts a very different scenario. Oscar III did not desert his son. Rather, with the exception of thirteen months of child-support payments, Oscar III attempted in many respects to maintain a relationship with his son. Although we do not condone behavior in contravention of a court order, it would be unjust to focus only on the issue of nonpayment of support in determining whether the fundamental and precious right of a natural parent to his child should be involuntarily terminated. As this court noted in *In re LaPorte*, 103 R.I. 232, 235, 236 A.2d 264, 266 (1967), that right should be forfeited only in extreme circumstances.

Furthermore, although the evidence supports the trial justice's findings that Oscar C. has a loving and supportive relationship with Mr. Martini; that Mr. Martini would be a suitable adoptive father; and that it is the child's desire to have the adoption take place; these findings do not address the crucial issue in this case. Section 15–7–5(b)(2) requires a finding by clear and convincing evidence that Oscar III "willfully neglected to provide proper care and maintenance for the child for a period of one year." Section 15–7–7(1)(a). For the reasons stated, we conclude that the evidence does not support such a finding.

Accordingly respondent's appeal is sustained, the decree appealed from is reversed, and the case is remanded to the Family Court for further proceedings in accordance with this opinion.